UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 90-3862

_____


JUNIOR MONEY BAGS, LTD.,
A Louisiana Corporation,

                        Plaintiff-Appellant
                        Cross-Appellee,

              versus

MOEY SEGAL,

                        Defendant-Appellee
                        Cross-Appellant-Third Party
                        Plaintiff-Appellant,

              versus

BLAINE S. KERN,

                        Third-Party Defendant-Appellee.

* * * * * * * *

NEW ORLEANS CITY OF,

                        Plaintiff,

              versus

MOEY SEGAL,

                        Defendant-Third Party
                        Plaintiff-Appellant,

              versus

BLAINE S. KERN,

                        Third-Party Defendant-Appellee.

_____

Appeals from the United States District Court for the
Eastern District of Louisiana
_____

(August 17, 1992)

Before THORNBERRY and GARWOOD, Circuit Judges[*].

GARWOOD, Circuit Judge:

Plaintiff-appellant Junior Money Bags, Ltd. (Money Bags) appeals the district court's dismissal of its claim for declaratory relief. Defendant-cross-appellant Moey Segal (Segal) appeals the district court's dismissal of its counterclaim against Money Bags and third party claim against Blaine Kern (Kern). Finding no reversible error, we affirm.

**Facts and Proceedings Below**

To facilitate its construction and operation of a gondola system over the Mississippi River at New Orleans, the Mississippi Aerial River TransitSQPerez, Inc. (MART) entered into a lease with Money Bags. Money Bags is a Louisiana corporation wholly owned by Kern. In the lease, MART leased land and airspace to construct the westbank tower support and landing station for the gondola. Section 9 of the lease provided in part:

> "Lessee may construct towers for the [gondola] System . . . at Lessee's expense, which towers shall at the termination of this lease become the property of Lessor, subject to the rights of Banque de L'Union Europeenne ("BUE"), or BUE's assignee or transferee. Lessee, however, expressly waives all right to compensation

_____

[*]  Judge Davis, a member of the panel hearing oral argument, subsequently recused himself. The decision of the panel is accordingly rendered by a quorum. 28 U.S.C. § 46(d).

2

> therefor. The Lessor, at its option, may, however, require the leased premises to be replaced in their original condition resulting in Lessee having to remove the towers and all underlying foundations."

The lease further provided that it shall terminate "on the earlier of April 30, 2083 or three (3) months after cessation of using the leased premises as an integral part in the operation of an aerial river crossing system."

MART obtained financing for the gondola through Banque de L'Union Europeenne (BUE). As security, MART executed three instruments: a collateral mortgage, a collateral chattel mortgage, and an Assignment of Contracts and Permits. In the collateral chattel mortgage, MART mortgaged its physical properties, including the westbank tower that was to be built on Money Bags' property, and certain contracts, including the Money Bags' lease.

The gondola system was completed in 1984 and operated in conjunction with the World's Fair in New Orleans that year. However, shortly after the World's Fair concluded, the gondola ceased operation.

At approximately the same time, MART defaulted on its loan with BUE. BUE filed suit in the United States District Court for the Eastern District of Louisiana to recover the unpaid balance of its loan. On October 31, 1986, a consent judgment was entered in favor of BUE against MART. By the terms of the judgment, the court recognized and maintained BUE's security interests, including its interest in the lease with Money Bags.

On May 4, 1989, Segal purchased the consent judgment from BUE for one million dollars, and the district court substituted Segal

as the judgment creditor entitled to exercise all of the rights granted by the consent judgment. Thereafter, Segal executed the judgment and a marshal's sale was held. At the marshal's sale, Segal was the only bidder and by marshal's deed acquired all of the property that constituted the gondola system, including the lease with Money Bags.

On September 16, 1986, Money Bags sued MART in Louisiana state court seeking judicial termination of the lease in question. The suit was dismissed without prejudice on October 18, 1989.

After the marshal's sale, Segal attempted to negotiate a servitude agreement with Money Bags to allow him to operate the gondola system. In the proposed agreement drafted by Segal's counsel it is recited that Segal is the owner of the foundations. Money Bags rejected the servitude and suggested instead an amendment to the Money Bags/MART lease. New Orleans Mayor Sidney Bartholemy became involved and attempted to facilitate an agreement between the parties to keep the gondola in New Orleans. Negotiations, however, broke down. Segal hired Arthur Tolar to negotiate with officials in Corpus Christi, Texas, regarding moving the gondola there. The Texas State Aquarium was being built in Corpus Christi, and Segal apparently thought that the gondola might serve as transportation across the channel to the aquarium from the city proper.

In a letter dated October 12, 1989, Segal's attorney requested permission from Kern and Money Bags on behalf of his client "to come on your land to remove the Gondola Tower," purportedly so the gondola could be moved to Corpus Christi. Kern's attorney

4

responded in a somewhat elliptical letter dated October 13, 1989. The letter began by acknowledging receipt of the letter of October 12, 1989, which "was evidently being written on behalf of Mr. Moey Segal but does not so state" and continued by stating that if the letter were written on behalf of Segal to so advise and provide Segal's address. The letter went on to say, "In the event that you have any legal basis (other than the MART lease) or authority requiring Junior Money Bags, Ltd. to allow Mr. Segal to traverse its property or to remove the gondola tower located therein, please furnish us with the basis for your opinion for our review." The letter closed by stating that Money Bags "does not grant your unnamed client permission to come on its land to remove the gondola tower but is willing to reconsider its position based on your response to this letter."

Segal's lawyer responded on October 17, 1989, explicitly on behalf of Segal. The letter stated that Money Bags' intentional refusal to allow Segal to obtain possession of his property was causing Segal damages of at least $15 million, demanded immediate payment thereof, and threatened suit if such payment was not immediately forthcoming.

On October 18, 1989, Money Bags sued Segal, seeking a declaration that Segal's right of occupancy under the lease had terminated and that Segal had succeeded to MART's obligation to remove the gondola tower and underlying foundation from the leased property. As an alternative to requiring Segal to restore the leased premises to their original condition according to the terms of the lease, Money Bags sought relief in the form of money damages

5

in an amount sufficient to cover the costs of removal plus attorneys' fees and costs. In order to obtain personal jurisdiction over Segal, Money Bags sought a writ of nonresident attachment against the property Segal had acquired in the marshal's sale. When Segal submitted himself to the jurisdiction of the district court, Money Bags released the attachment.[1]

Segal counterclaimed against Money Bags and filed third party demands against Kern and the City of New Orleans. Segal alleged wrongful conversion, tortious interference with business relations and opportunities, interference with contract, and abuse of process.

Segal filed a Motion for Summary Judgment. In a minute entry dated May 22, 1990, the district court granted Segal summary judgment in part. The district court held that Segal had no obligation to remove the foundations and restore the land to its original condition. The district court noted that the leased premises had not been used as an integral part of the operation of an aerial river crossing system for a period of far longer than three months prior to the filing of the lawsuit. However, because of the potential for uncertainty regarding when the leased premises stopped being used as an integral part of the system, the district court found that the lease had not expired as a matter of course

---

[1]    In the district court, one of Segal's counterclaims was based on abuse of process by wrongful attachment. The district court ultimately dismissed the counterclaim. While Segal does not challenge the district court's ruling on the abuse of process by wrongful attachment claim, we note in passing that there appears to be nothing improper in this use of the writ of attachment to obtain jurisdiction over a nonresident defendant such as Segal.

and judicially dissolved the lease effective from the date of its ruling. The district court then determined that Segal had not assumed the obligation under the lease of removing the gondola tower because Segal had never been in a position to acquire any real rights or benefits under the lease. The district court noted that even though the lease had not formally terminated, the leased premises had not been used in the operation of an aerial river transport system for three years prior to Segal's acquisition. Money Bags thus had the option of procuring a judicial dissolution of the lease at any time; there was thus no unexpired term of the lease for Segal to acquire. The district court refused to require Segal to discharge the obligations under the lease when he had never had an opportunity to enjoy the benefits, and accordingly entered summary judgment in his favor on the issue of restoring the land.

Money Bags promptly filed a Motion to Reconsider and its own Motion for Summary Judgment. In a second minute entry dated July 12, 1990, the district court disposed of these motions and addressed the source of Segal's right to claim ownership of the gondola tower while at the same time avoiding the obligation of removing the foundations and restoring the land. The court stressed that Segal's rights to the tower derived not from the lease, but from the chattel mortgage that Segal had acquired from BUE. The court noted that at the termination of the lease, Money Bags also acquired an ownership interest in the tower under the lease, and proceeded to determine whose interest had priority. In deciding that Segal's interest deriving from the chattel mortgage

7

had priority, the district court rejected Money Bags' argument that MART's interest in the tower was subject to Money Bags' option to retain ownership of the tower at the expiration of the lease. The court concluded that MART's interest was unencumbered because Money Bags' interest did not arise until the tower was built, after MART had executed the chattel mortgage to BUE, and because the lease specifically conditioned Money Bags' option to assert ownership on the rights of BUE. The court explained:

> "Therefore, the rights that Segal acquired from [BUE] pursuant to the collateral chattel mortgage were not burdened by Money Bags' right to claim ownership of the tower under the terms of the lease. Accordingly, the court concludes that, having acquired [BUE]'s rights and having been substituted as the judgment creditor entitled to exercise all rights granted by the consent judgment previously rendered, Segal is entitled to claim ownership of the westbank tower to the gondola incident to his rights that flow from the collateral chattel mortgage between MART and Banque."

The court thus granted in part and denied in part Money Bags' motions for reconsideration and for summary judgment. The court declared Segal to be the owner of the westbank gondola tower and to be entitled to access to Money Bags' land to remove the tower without obligation to remove the foundations. The court also granted Money Bags' partial summary judgment and dismissed Segal's claim for intentional interference with contractual relations on the grounds that no such tort existed in Louisiana.[2]

---

[2]     Segal does not challenge on appeal the district court's dismissal of his claim for intentional interference with contractual relations. We note in passing that such dismissal appears to be correct. The Louisiana Supreme Court has recently recognized the tort of interference with contract, but stressed its restrictive scope:

> "It is not our intention, however, to adopt whole and

After thus disposing of Money Bags' claims and Segal's counterclaim for interference with contract, a bench trial was held on Segal's remaining counterclaims and third party claims, namely abuse of process, abuse of rights, tortious inference with business relations, and conversion. On October 24, 1990, the district court entered its Findings of Fact and Conclusions of Law and dismissed all of Segal's counterclaims. In its Judgment of October 29, 1990, the district court dismissed Money Bags' action and Segal's counterclaims with prejudice. Both Segal and Money Bags appeal.

## Discussion

Because Money Bags and Segal each appeal from the district court's judgment, we will address separately the arguments relating to Money Bags' complaint and Segal's counterclaims. As a prelude, we note that both Money Bags' claims and Segal's counterclaims are governed by Louisiana substantive law, and as the Supreme Court recently held, we "review *de novo* a district court's determination of state law." *Salve Regina College v. Russell*, 111 S.Ct. 1217, 1221 (1991). Our role when presented with an unsettled point of

---

undigested the fully expanded common law doctrine of interference with contract, consisting of `a rather broad and undefined tort in which no specific conduct is proscribed . . . .' In the present case we recognize . . . only a corporate officer's duty to refrain from intentional and unjustified interference with the contractual relation between his employer and a third person." *9 to 5 Fashions v. Spurney*, 538 So.2d 228, 234 (La. 1989).

Federal courts have respected the restricted nature of this new delict. *See American Waste & Pollution Cont. v. Browning-Ferris*, 949 F.2d 1384, 1386-90 (5th Cir. 1991); *Nowling v. Aero Services Intern.*, 752 F.Supp. 1304, 1310 (E.D. La. 1990); *Matrix v. Drug Emporium*, 756 F.Supp. 280, 284. The district court properly dismissed this claim.

state law "is to determine how the [Louisiana] Supreme Court would resolve the issue if presented to it." *American Waste & Pollution Cont. v. Browning-Ferris*, 949 F.2d 1384, 1386 (5th Cir. 1991) (quoting *Coatings Mfrs. Inc. v. DPI, Inc.*, 926 F.2d 474, 479 (5th Cir. 1991)).

I.  Money Bags v. Segal

On appeal, Money Bags argues that the district court erred in holding that Segal derived the right to remove the gondola towers without being bound by any obligation to remove the foundations under the lease.  Money Bags contends that Segal's right to the towers arises solely from the lease, and thus Segal cannot remove the towers without becoming subject to the obligations of the lease, through which Money Bags could either require Segal to remove the foundations as part of restoring the land to its original condition or choose to retain both the towers and foundation.  Alternatively, Money Bags contends that if the lease is held not to govern, Segal's and Money Bags' rights are established by article 493 of the Louisiana Civil Code, and under article 493 Segal is obligated to remove the foundations.

*A.  Competing interests in the gondola system*

Segal wore two different hats in claiming rights to the gondola system.  After MART defaulted on its loan with BUE, BUE sued and a consent judgment was entered in favor of BUE against MART.  By the terms of the judgment, the court recognized and maintained BUE's security interests, including its interest in the lease with Money Bags and in the collateral chattel mortgage.  On May 4, 1989, Segal purchased BUE's rights under the consent

10

judgment, and the district court substituted Segal as the judgment creditor. A writ of *fieri facias* was subsequently entered directing the marshal to seize and sell the property of MART mortgaged to BUE. Specifically included was "the property encumbered by that certain Collateral Mortgage and Collateral Chattel Mortgage granted by [MART]"[3] and "the right, title and interest of [MART] to the following: . . . (f) Lease from Junior Money Bags, Ltd. to Borrower dated September 28, 1983."[4] Segal was the successful purchaser at the execution sale. The marshal subsequently executed a deed to Segal transferring all of MART's property and rights mortgaged to BUE, including the Money Bags' lease and "all buildings, improvements, structures, towers and other betterments located on the aforedescribed properties whether now existing or hereinafter constructed," and all of MART's interest in the permits or contracts listed in the Assignment of Contracts and Permits, including the Money Bags' lease, necessary to permit the purchaser to exercise the rights to operate the gondola system. The Deed also directed the Recorder of Mortgages to cancel the Collateral Chattel Mortgage granted by MART on any document in which it was listed as an encumbrance. Segal thus not

---

[3] The Lease from Junior Money Bags to MART was one of the properties mortgaged by MART in the Collateral Chattel Mortgage. Also included were "all buildings, improvements, structures, towers and other betterments located on the aforedescribed properties whether now existing or hereinafter constructed."

[4] In addition to the Money Bags' lease, twelve other leases, ordinances, agreements, and servitudes were listed as rights, titles and interests of MART specifically included in the seizure and sale. These thirteen interests were the same interests listed in the "Assignment of Contracts and Permits" from MART to BUE.

11

only acquired MART's interest in the lease, but also acquired all of MART's ownership interest in the gondola system by foreclosing on the chattel mortgage and purchasing the system at the execution sale. We do not understand Money Bags to dispute, or have disputed, this.

Money Bags, however, also had an interest in the gondola system. The lease between MART and Money Bags provided that MART could construct towers on Money Bags' land, but at the termination of the lease, the towers became the property of Money Bags, subject to the rights of BUE, or BUE's assignee or transferee.

We recognize that wearing either hat, Segal could acquire no greater interest in the gondola system than his transferor had. *See* LA. CIV. CODE ANN. arts 2620, 3142 (West 1952). The rights that Segal has in the lease are thus equivalent to the rights that MART had in the lease. Money Bags, however, conflates the interest that Segal had in the gondola system through his purchasing the chattel mortgage and subsequently foreclosing on it at the execution sale with Segal's purchase of MART's interest as lessee under the lease. While Segal could only acquire the rights that BUE had in the chattel mortgage, and BUE could only acquire a security interest in the property rights that MART had, MART's property rights to the tower do not arise from the lease. MART did not acquire the gondola system from or through Money Bags. MART independently acquired an ownership interest in the gondola system, not simply a right of possession as a lessee.[5] In granting a security interest

---

[5] Money Bags contends that MART, and subsequently Segal, had only the *dominium utile* of the improvements until Money Bags

in the gondola system to BUE, MART conveyed to BUE the ownership rights to the gondola system if a stated event occurred, namely a default by MART. This is essentially the same right that MART granted to Money Bags in the lease; MART conveyed to Money Bags the ownership rights to the gondola system on a stated occurrenceSQnamely the termination of the lease and Money Bags' decision to retain the gondola.

The inquiry thus becomes what the district court correctly focused onSQwhether Money Bags or Segal had the prior interest in the gondola system. The lease and chattel mortgage were executed concurrently. The district court noted that under Louisiana law, chattel mortgages are effective from the date of recording. The district court also found that Money Bags' right to claim ownership of the tower came into existence only when the tower was erected. *See Smith v. Bratsos*, 12 So.2d 245, 248-49 (La. 1942). In *Bratsos*, the Louisiana Supreme Court held that a chattel mortgage primes a

---

exercised its option under the lease to decide whether to retain the tower and foundations at the termination of the lease. Money Bags, however, does not define *dominium utile*; thus, we turn to Black's Law Dictionary, which notes that in the civil law, *dominium utile* means "equitable or praetorian ownership." BLACK'S LAW DICTIONARY 486 (6th ed. 1990). It stands in contrast to *dominium directum*, which in civil law means strict ownership. *Dominium directum et utile* represents ownership in the manner we normally envisage it: "The complete and absolute dominion in property; the union of the title and the exclusive use." *Id.* Money Bags' assertion that MART had only the *dominium utile* (or right of possession) of the gondola system mischaracterizes MART's interest. By necessity, if MART had only the *dominium utile* until the lease's end, someone, presumably Money Bags, must have retained the *dominium directum*. The Money Bags' lease, however, clearly provides that the towers shall become the property of lessor "at the *termination* of the lease." Money Bags' characterization of MART's and Segal's interest, besides having no adequate support in Louisiana law, appears illogical in light of this provision in the lease.

13

lessor's lien where "the mortgage on the chattel was recorded prior to the time the chattel was placed in the leased premises." Money Bags contends forcefully that *Bratsos* is not applicable because it has not asserted a lessor's lien. Despite this distinction, we find *Bratsos* convincing. *Bratsos* stands for the general proposition that a security interest arising from a chattel mortgage has priority over a lessor's interest in the chattel under a lease if the mortgage is perfected before the chattel is placed on the land. In *Bratsos* itself, the Louisiana Supreme Court rejected the contention that a prohibition in the lease against installing equipment subject to a chattel mortgage that would take precedence over the lessor's lien affected the rights of the mortgagee and prevented him from claiming a prior interest. *Id.* The court noted that "[t]he violation of such a provision in the lease might be grounds to set aside or annul the lease, but it could not affect third parties who held a mortgage on a chattel before the chattel was placed in the leased premises." *Id.* The provision in the Money Bags' lease is functionally similar to the prohibition in *Bratsos;* both attempt to preserve the lessor's claim to chattels placed on the land that arises on termination of the lease. We refuse to find, following *Bratsos*, that such a provision in the lease displaces the chattel mortgagee's claim.

In this case, the record reflects that the movables were not placed on the land and work did not begin on the systemSQall of which was done by MART or its contractorsSQuntil after the chattel mortgage was recorded and perfected. Under the reasoning of *Bratsos*, BUE's interest in the gondola system was thus senior to

14

Money Bags'; Segal inherited BUE's interest in the chattel mortgage, unencumbered by any interest of Money Bags. Money Bags focuses solely on Segal's rights and obligations under the lease; it does not address Segal's rights under the chattel mortgage. While Money Bags concedes that Segal took in two different capacities, it ignores that crucial fact in focusing on the lease as the sole source of Segal's rights.

### B. Segal's purchase of the lease

We must next address whether Segal, by acquiring the lease at the execution sale, became obligated to remove the foundations and return the property to its original condition under and by virtue of the terms of the lease. Instead of foreclosing separately on the gondola system and the lease and holding separate execution sales, Segal caused one writ of execution to be issued and an *in globo* sale to be held. Segal, among other things, purchased the lease at the execution sale, apparently because he was not convinced that it was an unarguable nullity and wanted to prevent someone else from purchasing the lease and attempting to claim some rights to the gondola system under the lease.

The lease is clear that any successor to MART's interest under the lease is obligated to the same extent as MART. While Segal is in the strictest sense a successor, we question whether a successor to the lessee's interest after the lease has terminated for all intents and purposes is a successor within the meaning of the lease required to discharge the obligations of the lease. The district court resolved this issue in favor of Segal. The district court specifically refused to find that the lease had wholly terminated

15

on its own, necessitating the judicial dissolution of the lease. However, the district court reasoned that because the gondola had not been used for over three years at the time Segal acquired the lease, Money Bags had possessed the unconditional right to procure dissolution of the lease long before, and ever after, Segal acquired it. Segal had thus in actuality not acquired any rights under the lease because any time Segal attempted to assert a right, Money Bags could have the lease dissolved. The district court accordingly refused to impose the obligations under the lease on Segal because it would be inequitable.

We do not disturb this conclusion. We note after reviewing the record that Segal never claimed a right to the gondola system under the lease or represented that the lease was still effective. Indeed, in the above-mentioned October 12, 1989, letter from Segal's counsel to Money Bags, Segal indicated specifically that he did not feel bound by any lease between Money Bags and a third party. Additionally, we note that before Segal had even purchased the lease at the execution sale, Money Bags had sued MART in Louisiana state court to have the lease dissolved. Segal could never enjoy the benefits of or any rights under the lease because Money Bags could dissolve the lease at any time, and therefore Segal's mere purchase of the lease at the foreclosure did not bind him to personally discharge the lessee's removal obligations under the lease. *Cf. Grace-Cajun Oil Co. No. 3 v. MBank*, 882 F.2d 1008, 1012 (5th Cir. 1989).

*C. Article 493*

Money Bags' last argument is that if we reject its claims based on the terms of the lease, nevertheless Segal is still obligated to remove the foundations under article 493 of the Louisiana Civil Code.  Article 493 provides:

> "Buildings, other constructions permanently attached to the ground, and plantings made on the land of another with his consent belong to him who made them.  They belong to the owner of the ground when they are made without his consent.
>
> "When the owner of buildings, other constructions permanently attached to the ground, or plantings no longer has the right to keep them on the land of another, he may remove them subject to his obligation to restore the property to its former condition.  If he does not remove them within 90 days after written demand, the owner of the land acquires ownership of the improvements and owes nothing to their former owner."  LA. CIV. CODE ANN. art. 493 (West Supp. 1992).[6]

The Louisiana Supreme Court has discussed article 493:

> "[T]his article fills a gap in the code, which previously had neglected to specify the rights and obligations between the owner of the improvements and the owner of the ground when their legal relationship terminated. This paragraph may apply when a lease expires . . . .  It gives the owner of the improvements the right to remove them, but if he does not do so ninety days after written demand, the owner of the land acquires ownership of the improvements.  *It does not give the new owner of the improvements the right to compel removal by the old*

---

[6]     We note that this version of article 493 was enacted in 1984, after the lease and chattel mortgage had been executed. The previous version of article 493 had no provision requiring the owner of improvements to restore the property if he removed the improvements.  While it is not clear that the amended version of article 493 should apply to relationships that existed before 1984, neither of the parties have questioned its applicability in this case.  Additionally, we note that the Louisiana Supreme Court has applied the amended article 493 in a situation where a servitude agreement was entered into in 1955 and allegedly terminated after 1984.  *See Guzzetta v. Texas Pipe Line Co.*, 485 So. 2d 508, 511 (La. 1986).  Accordingly, we assume that the amended article 493 applies.

17

*owner, nor to recover payment for the costs of removal."*
*Guzzetta v. Texas Pipe Line Co.*, 485 So.2d 508, 511 (La.
1986) (emphasis added).

Because MART made the improvements with Money Bags' consent, MART, and subsequently Segal, was the owner of the improvements under article 493.  After the lease terminated, Segal had the right to remove the gondola system "subject to his obligation to restore the property to its former condition."   Thus, article 493 affords Segal the relief he is seeking in this lawsuit:  he has the right to remove the towers. If Segal does not remove the improvements, Money Bags can demand removal in writing, and 90 days after such demand, Money Bags, as owner of the land, acquires ownership of the improvements without owing any compensation to Segal.   However, under article 493, Money Bags has no right "to compel removal by the old owner, nor to recover payment for the costs of removal" of the gondola system.   *Guzzetta*, 485 So.2d at 511;   *see also* Symeonides, *Developments in the Law: 1983-84, Property*, 45 LA. L. REV. 541, ___ ("Under new article 493, . . . the landowner does not have the right to force removal at the builder's expense . . . ."). *Compare* LA. CIV. CODE ANN. art. 495 (providing the owner of an "immovable," to which another consensually attaches or incorporates things that become component parts of the immovable, with the right to have the improvements removed at the expense of the person who made them).[7]  Money Bags sole remedy is to retain the improvements

---

[7]    Money Bags has not relied on Art. 495.  Under La.R.S. 9:5357 a movable subject to a chattel mortgage that is installed on immovable property so as to become immovable nevertheless "shall be and will remain movable insofar as the mortgage upon it is concerned."

18

without incurring any obligation to pay for them.  As noted by a commentator, under new article 493, "it seems that in the case of improvements which are valueless, yet costly to remove, the landowner is at the mercy of the builder, since he cannot force removal at the builder's expense."  Symeonides, 45 LA. L. REV. at ___.

We also hold that in this particular setting Segal is not required to remove "all or nothing" under article 493.  Segal wants to remove the gondola towers, which are readily and designedly separable from the foundations, without being required to remove the foundations, which are anchored by underground pilings.  While we could unearth no Louisiana case or scholarly writing addressing this issue and it is not expressly covered by article 493, we conclude that, on the facts of this case, such a course appears to be permissible under the general structure of article 493.  Under article 493, if Segal chose not to remove any portion of the gondola system from Money Bags' land, Money Bags could not force Segal to remove the system or be reimbursed for the costs of removal.  On these facts, it appears that Segal can remove the towers without damaging the foundations.  While the foundations likely have little utility except as part of a gondola or similar system, removing the towers does not impair Money Bags' ability to replace towers on the foundations at some point in the future. Because partial removal of the system by Segal does not damage what remains on Money Bags' land, we find it inconsistent with the overall structure of article 493 to afford Money Bags a right to force removal if Segal chooses to remove part of the system where

19

Money Bags would not be afforded a similar right if Segal chose not to remove anything.

  II.  Segal v. Money Bags and Kern

    *A.  Interference with business relations*

Segal asserts that when Money Bag's attorney wrote the above-referenced letter of October 13, 1989, Segal was prevented from removing the westbank tower and from forming a profitable relationship with Corpus Christi to place the gondola system at the aquarium there.  Following the bench trial, the district court found that Segal failed to establish a claim because he did not show any communications between Money Bags or Kern and officials in Corpus Christi.  The district court also found that Segal failed to show that his negotiations with officials in Corpus Christi had progressed to the stage where interference would have been tortious:  "Segal's negotiations with Corpus Christi were only in the embryonic stage when Segal himself terminated them."

Segal contends that Louisiana courts have recognized a tort of interference with business relations consistent with that found in RESTATEMENT (SECOND) OF TORTS § 766B.  Section 766B provides:

> "One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
>
>     "(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
>     "(b) preventing the other from acquiring the prospective relation."

Segal does not dispute the district court's conclusion that he has failed to state a claim under section 766B(a), but asserts that he

has stated a claim under section 766B(b).

Louisiana courts have recognized a cause of action for tortious interference with business. *See Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 601 (5th Cir. 1981) (citing *Graham v. St. Charles St. Railroad Co.*, 47 La.Ann. 1656, 18 So. 707 (1895)). This tort does not appear to be as broad as it is under the RESTATEMENT or as Segal urges. *See Nowling v. Aero Services Intern., Inc.*, 752 F.Supp. 1304, 1311-12 (E.D.La. 199). In Louisiana, the delict is based on the principle that the right to influence others not to deal is not absolute. *See Ustica Enterprises, Inc. v. Costello*, 434 So.2d 137, 140 (La. App. 5th Cir. 1983); *see also Muslow v. A.G. Edwards & Sons, Inc.*, 509 So. 2d 1012, 1020 (La. App. 2d Cir. 1987), *writ denied*, 512 So.2d 1183 (La. 1987). We summarized in *Dussouy* that "Louisiana law protects the businessman from `malicious and wanton interference,' permitting only interferences designed to protect a legitimate interest of the actor." *Dussouy*, 660 F.2d at 601. "Thus, the plaintiff in a tortious interference with business suit must show by a preponderance of the evidence that the defendant improperly influenced others not to deal with the plaintiff." *McCoin v. McGehee*, 498 So.2d 272, 274 (La. App. 1st Cir. 1986) (citing *Ustica*, 434 So.2d at 140). The district court properly held that because Segal had made no showing that Kern or Money Bags influenced third parties (*i.e.*, those representing Corpus Christi) not to do business with Segal, Segal has not stated a claim within the present construct of the Louisiana tort. As a federal court sitting in diversity, we decline to significantly expand the scope

21

of this very limited form of recovery. *See Mitchell v. Random House, Inc.*, 865 F.2d 664, 672 (5th Cir. 1989) (declaring that "in diversity cases, `it is not for us to adopt innovative theories of recovery or defense for . . . [Louisiana] law, but simply to apply that law as it currently exists'") (quoting *Galindo v. Precision American Corp*, 754 F.2d 1212, 1217 (5th Cir. 1985)).

   *B.   Conversion*

Conversion is the commission of a wrongful act of dominion over the property of another in denial of or in a manner inconsistent with the owner's rights. *Security Home Mort. Corp. v. Bogues*, 519 So.2d 307 (La. App. 2d Cir. 1988). Segal argues that Kern and Money Bags converted his property, namely the westbank tower, by refusing to grant him permission to remove the tower on October 13 and by filing a writ of attachment on the property in order to gain jurisdiction over Segal. The district court determined, following the bench trial, that neither act constituted a conversion. First, the district court found that "Money Bags did not unequivocally tell Segal he could not come onto its property." Specifically, the district court noted that Segal's counsel had informed Money Bags that his unnamed client did not consider himself bound by the lease with MART, which contained provisions requiring that liability insurance be obtained before any demolition of the gondola system proceed. The district court found that Money Bags made a reasonable inquiry concerning Segal's removal of the tower and procurement of insurance, but "immediately after questioning Segal's right to remove the tower without regard to the foundation, Money Bags was presented with a demand for

22

$15,000,000 for a mere three-day delay in granting access to its property."  The district court further found that "Money Bags was not unreasonable in seeking some type of insurance or other protection against potential liability claims as land owner in connection with the tower removal."  With regard to the second claim, the district court found that "[t]he filing of the non-resident attachment suit was not an act inconsistent with Segal's ownership."  The court noted that in filing the attachment, Money Bags had to allege that the property was owned by Segal and that conversion cannot arise from the exercise of a legal right.

The district court was not clearly erroneous in finding that Money Bags did not convert Segal's property.  We first address the conversion claim based on what Segal characterizes as the wrongful attachment.  Attachment is a proper method of obtaining jurisdiction over a party.  LA. CIV. CODE ANN. art. 9.  Once Segal, a nonresident, appeared by filing a counterclaim and thus submitted to the jurisdiction of the trial court, Money Bags dismissed the attachment.  Conversion cannot arise from the exercise of a legal right.  *Commercial Credit Equipment Corp. v. People's Loan Serv., Inc.*, 351 So.2d 852 (La. App. 2d Cir. 1977); *Delort Hardware Co. v. Peoples Bank & Trust*, 490 So.2d 547 (La. App. 4th Cir. 1986).

Segal's claim that Money Bags converted his property by denying him access to remove the tower gives us a little more pause.  Ultimately, however, we hold that the district court's finding that Money Bags did not unequivocally deny Segal access to the land is not clearly erroneous.  The letter from Money Bags' counsel to Segal dated October 13, 1989, is, when viewed in its

23

entirety, clearly an invitationSQalmost a pleaSQto negotiate.  The letter requests a response detailing Segal's name and address and any authority besides the lease that Segal relied on in claiming a right to go on the land or remove the towers.  Finally, we note that a careful reading of the letter reveals that Money Bags' counsel did not deny Segal entry on the land, but instead simply declined to affirmatively grant Segal permission to enter and expressly stated that Money Bags was "willing to reconsider its position based upon your response to this letter."  There is a distinction, albeit a fine one, between refusing someone entry and not granting permission to enter.  There was no evidence either of any threat of any kind or of any sort of obstruction or anything similar by Money Bags.  It simply declined to make an affirmative grant of permission.

Nor was the district court clearly erroneous in finding that Kern's reasonable concerns about insurance prompted him to decline to grant Segal permission to enter his land and remove the towers. Money Bags' lease with MART specified that before the gondola was demolished, a specific plan and insurance must be provided.  While the district court subsequently determined that Segal was not bound by the lease with MART, Segal had purchased the lease and it was not wholly clear on October 13, 1989, that Segal was not bound by it.  Additionally, the existence of the gondola towers alone, and certainly their removal, presented a real threat of injury making insurance a necessary concern.  Given Kern's reasonable concerns about injury and the need for insurance, Kern's insistence that Segal obtain insurance before Money Bags would grant permission for

24

entry to remove the towers is not a wrongful act inconsistent with Segal's rights.[8]  The land belonged to Money Bags, and Segal had no absolute, unfettered right of entry onto it, but only an implied right of reasonable entry for purposes of proper removal of the towers.

## Conclusion

Concluding that neither Money Bags nor Segal has demonstrated reversible error, we affirm.

AFFIRMED

---

[8]    Segal contends that Kern's concerns about insurance were never communicated to him.  The district court, however, could legitimately have found otherwise.  Segal testified at the bench trial that Kern told him about the insurance and was always talking about insurance;  Segal simply discounted Kern's talk about insurance as a mere negotiating ploy.