RGOTHARD, Judge.
Defendant, Bank of Louisiana in New Orleans, appeals a decision of the trial court in favor of the plaintiffs, Shirley and Richard Carriere, awarding $898,082.05 in rent and property taxes due pursuant to a lease, plus attorney fees.
The Carrieres own a plot of commercial property in Metairie. In 1982 they entered into an agreement for the development of that property with Frank A. Occhipinti, Inc. (Occhipinti). The agreement between the parties was reduced to writing in the form of a ground lease signed on April 23, 1982. In that agreement Occhipinti leased the property for five years commencing on October 23, 1982. The ground lease also contained an option to extend the lease for two additional five year periods, or until 1997, “upon notice *493 in writing to the LESSOR of LESSEE’S intention to exercise said option, given at least six (6) months prior to the expiration of the term hereof’.
|sThe lease contemplated that Occhipinti would construct, “at its sole cost and expense, improvements to include a building, driveways and parking area” to be used as a restaurant. In article 8, the lease provides that:
Upon termination of the lease, for any reason whatsoever, LESSEE shall return to LESSOR, without cost to LESSOR, the leased ground with such improvements or structures that may have been erected thereon during the term of this Lease, by LESSEE and to convey and vest in LESSOR, title to such buildings, improvements or structures, free and clear of any liens, rights, title, interest, claim or demand whatsoever and to deliver to LESSOR such instrument of title or Deed which LESSOR may reasonably require conveying to LESSOR and vesting in LESSOR, title to such improvements, buildings or structures.
The lease also contains an option to purchase whereby Occhipinti had a “right to purchase the premises at the end of the fifteenth (15th) year of the lease period for 75% of its appraised value or SEVEN HUNDRED FIFTY THOUSAND AND NO/lOO ($750,-000.00) DOLLARS, whichever sum is greater, all cash to seller, and LESSEE will notify LESSOR twelve (12) months in advance of his intent to purchase”. Thus, it is apparent from those two clauses in the lease that the parties intended that the building should be owned separately from the ground during the pendency of the lease, and that at the end of the lease ownership of the building would fall to the Carrieres unless Occhipinti purchased the land.
It is also apparent from the lease that the parties understood that Occhipinti would require financing for the project. The lease contains article 10 entitled, “MORTGAGING OF LEASEHOLD ESTATE”, which in part provides as follows:
(B) Such mortgagee or holder of indebtedness shall have the privilege of performing any of LESSEE’S covenants hereunder or of curing any default by LESSEE hereunder or of exercising any election, option |4or privilege conferred upon LESSEE by the terms of this LEASE.
(E) No liability for the payment of rental or the performance of any of LESSEE’S covenants and agreements hereunder shall attach to or be imposed upon any mortgagee or holder of any indebtedness secured by any mortgage upon the leasehold estate, all such liability being hereby expressly waived by LESSOR”.
Occhipinti constructed the building with financing provided by Gulf Federal Savings and Loan Association (Gulf Federal). A mortgage was placed on the building and improvements, as well as the leasehold interest. The ground lease agreement was amended on January 10, 1983 to accommodate and protect the lender’s interest. That amendment provides in pertinent part:
5. LESSOR and LESSEE agree that the LENDER shall be permitted at its option, to “stand in the shoes” of the LESSEE and to exercise, on behalf of the LESSEE or itself, all options and rights, and to fulfill all duties and requirements, and to pay any obligations, charges or expense encumbered upon LESSEE to pay. However, the exercising to these rights and meeting these obligations shall not be_ mandatory on the part of LENDER but shall be optional.
Article 8 of the original lease was amended to include the following sentence; “Except that the said improvements shall remain subject to the LENDER’S mortgage until said mortgage is fully paid”. Further, the parties agreed in article 19 of the amended lease, to subordinate any subsequent encumbrance on the land to the lender’s mortgage on the building. The amended lease was subsequently recorded.
On January 26,1987, Occhipinti refinanced the loan with Bank of the South and executed a collateral mortgage for $1,200,000.00 in favor of the Bank, using his leasehold interest and improvements as collateral. The ground lease [ swas amended again on June 26, 1987 to protect Bank of the South by substituting it for Gulf Federal in the lease. That amend- *494 merit also granted an additional option to extend the lease until 2002. Bank of Louisiana of New Orleans (Bank of Louisiana), defendant herein, has since acquired the assets of Bank of the South and, as successor in interest, became the holder of the note secured by the collateral mortgage on the leasehold estate.
Oechipinti filed for protection from creditors under Chapter 11 of the Bankruptcy Code, which he later converted to Chapter 7 on March 28, 1989. The trustee who administered the estate abandoned the leasehold interest on May 31, 1989, and dismissed the leasehold improvements as assets of value to the bankruptcy estate from the bankruptcy proceedings.
Oechipinti failed to make the lease payments to the Carrieres after January, 1989, and he failed to pay the 1988 property tax bill as required by the lease provisions. Shortly afterward the Carrieres served Oc-chipinti with a notice of default and filed eviction proceedings against him in which they demanded that the lease be terminated and the premises vacated. On July 25, 1989 Bank of Louisiana filed an action for foreclosure, and in due course purchased Ocehi-pinti’s leasehold interest at a sheriffs sale on September 20, 1989. That interest included the building and improvements located on the Carrieres’ land and the leasehold. On October 3, 1989 the Carrieres amended their eviction petition to name the Bank of Louisiana as a defendant.
The eviction proceeding went to trial and resulted in a judgment in favor of the Carri-eres which ordered the defendants to vacate the premises, declared the lease terminated, and granted the Carrieres a lessor’s privilege on the building. Bank of Louisiana appealed the matter to this Court and the judgment of the trial | (¡court was reversed. See Carriere v. Frank A. Occhipinti, Inc., 570 So.2d 43 (La.App. 5 Cir.1990), writ denied, 575 So.2d 392 (La.1991) in which the Court held that:
... as to Bank of Louisiana, the Carrieres were not entitled to terminate the lease and evict it. However, with regard to Bank of Louisiana’s argument that rejection of the lease by the trustee in bankruptcy had the effect of terminating the lease and, with it, the Carrieres’ rights, we hold that the lease agreement continues in effect until it is terminated or expires. The rejection of the lease by the trustee did not have the effect of terminating the lease, (citations omitted)
In that case this Court expressly did not rule on the ownership of the property, Bank of Louisiana’s mortgage rights, or the rights of either the Carrieres or Bank of Louisiana under the lease. However, the Court did find that:
The clear intent of these amendments was to protect the Bank of Louisiana’s interests in order to induce it to finance the restaurant project.
⅜: ⅜ ⅜ ⅜ # ⅜
In addition, the Carrieres have had the benefit of the deal: Bank of Louisiana’s predecessors provided the financing needed to make the restaurant enterprise possible. Their rights under the lease should be subordinate to those of the Bank of Louisiana, both by the terms of the lease and by equity. 570 So.2d at 45-46
On March 7, 1991 the Carrieres filed suit against Bank of Louisiana asserting that the bank was liable to them for rental payments under the lease, for property taxes for the years 1988-93 and, for necessary repairs to the building. Subsequently, the Carrieres amended their petition to assert a cause of action for unjust enrichment. The Bank of Louisiana filed an answer and reconventional demand for slander to title. The Bank of Louisiana filed a motion for summary judgment which was granted by the trial court dismissing the Carrieres’ suit. |7The Carri-eres appealed that judgment to this Court. See Carriere v. Bank of Louisiana, 602 So.2d 155 (La.App. 5 Cir.1992), in which this Court held that summary judgment was not appropriate, vacated the trial court’s judgment and remanded the matter for trial on the merits.
In accordance with that ruling the trial court conducted a trial and rendered judgment in favor of the Carrieres in the amount of $398,032.05. In the reasons for judgment the award is detailed to show that past due rent from September 20, 1989 to February *495 23,1994 calculated at $6,606.67 per month for a total of $330,820.01 was awarded. The court also awarded property taxes in the amount of $12,212.04, representing $2083.80 for the last three months of 1989, $2046.72 for 1990, $2433.36 for 1991, $2600.16 for 1992, and $2688.00 for 1993. The court also awarded attorney fees in the amount of $55,-000.00. Bank of Louisiana brings this appeal from that judgment.
At trial Richard Carriere testified that, although he was represented by counsel during the negotiations with Gulf Federal for the first amendment to the lease, he and his wife made the final decision to accept the amendment. He also testified that he understood the provisions; and stated that the reason for the amended lease was to induce Gulf Federal to make the construction loan on the building. He admitted full knowledge of the refinancing of the loan making Bank of the South and subsequently, Bank of Louisiana, the lender. He also testified that he knew of and attended the foreclosure sale. Mr. Car-riere stated that he had “an idea that (foreclosure) could happen” when negotiating the lease amendments. He further stated he thought that, if the bank bought the building it would, “pay rent, taxes, cover me with insurance, liability insurance and all other expenses that included in the lease all expenses (sic)”. Mr. Carriere said [she never envisioned a circumstance in which some entity would own the building on his land and not pay rent.
On cross-examination Mr. Carriere testified that he thought it was a possibility that Oechipinti would go bankrupt. Mr. Carriere admitted that he did not receive rent payments during Oechipinti’s bankruptcy proceedings. When questioned about the meaning and ramifications of the amendment to article 8 of the original lease which provides that the mortgage would survive the reversion of title to. the Carrieres, Mr. Carriere stated, “it remains on the property as long as there’s somebody to pay it which was Occhi-pinti, but he declared bankruptcy”. Mr. Car-riere denied that any provision in the lease provided that no liability for the payment of rental or performance of the lessee’s covenants under the lease can be imposed on the mortgagee or lender. He maintained that position even after rereading article 10E of the original lease.
Marshall Favret, the attorney who represented the Carrieres, testified that when Mr. Carriere first contacted him to draw up the agreement in 1982, he presented a document which was a “strange animal. It wasn’t a purchase agreement. It wasn’t an agreement to lease. It was a combination of an intent to lease on a purchase agreement”. It was eventually reduced to a ground lease, which is the original lease herein. Mr. Fav-ret testified that the restaurant was completed and ready for opening in December, 1982. At that time Gulf Federal was prepared to provide the permanent financing for the building, and negotiations for the amended lease began. Mr. Favret stated that his understanding of the January, 1983 amendment to the lease provided that, “the lender had the right to take over, to step into the shoes of the lessee, take over the lease, cure defects, but it had no obligation to do that”. He further stated |9that, if the bank elected to take over the obligations of Oechipinti, it would have to pay rent, insurance, and taxes and keep the premises in good condition. Mr. Favret also testified that article 8 of the amendment provided that the improvements would remain subject to the lender’s mortgage until that mortgage was fully paid. Mr. Favret testified that the effects of a default by Oechipinti were never discussed.
John Mmahat, chairman of the board and legal counsel for Gulf Federal, testified that he represented Gulf Federal in the lease amendment negotiations. He stated that his concern was to protect the lender because the owners of the land were not going to subordinate their interest to Gulf Federal’s mortgage, which meant that the mortgage would cover only the leasehold estate, not the land. Mr. Mmahat explained that the mortgage held by the bank on the leasehold estate had two parts; the building and improvements thereto, and the lease.
Mr. Mmahat agreed with Mr. Favret’s assessment of the meaning of the amended lease; that it gave the lender the option to take over the rights and obligations of the lessee. He stated that he considered the *496 possibility that Occhipinti would default on the loan and that foreclosure would be necessary. In that event he expected that the bank would have to pay rent. He also stated that he considered the option to buy the property a necessary protection for the bank in the event the “lessor and lessee were playing games among themselves”.
Mr. Mmahat testified he never contemplated filing a foreclosure proceeding if the lease terminated and title to the budding would vest in the Carrieres with the mortgage still intact because he never intended to have the mortgage extend to the land.
| ioMr. Edmond Miranne, legal representative of Bank of the South, testified that Bank of the South refinanced the mortgage originally held by Gulf Federal. He verified that the mortgage contained two assets, the improvements and the leasehold. He testified that he reviewed the lease and its amendment and concluded the bank was protected and the lease was subordinated to the mortgage. He concluded that the amendment was made to induce the lender to make the loan and that the bank had the right, but not the obligation, to step into the shoes of the lessee. He stated that, in the event of a foreclosure, he believed that the bank would not have to pay rent by virtue of the terms of the lease.
Mr. Miranne testified that if the bank foreclosed on the mortgage and, by adjudication became the owner of the leasehold estate, the bank would own the braiding and the improvements and would become the lessee “in rem” with regard to the lease. Mr. Miranne explained that he considered a lessee “in rem” to have no obligation under the lease unless it chose to exercise the rights under the lease.
Mr. Miranne testified that the bank has attempted to rent the braiding on at least two occasions and currently has a tenant operating a restaurant in the building. That tenant is not paying rent to the bank. Mr. Miranne testified that the bank permits the tenant to operate the restaurant rent-free to mitigate losses which would likely occur by allowing the building to remain vacant.
Mr. Harrison Scott, chairman of the board of Bank of the South, testified that he felt the lease was onerous to Occhipinti and that the bank never intended to accept the lease. It merely wanted protection for its loan and was given the protection necessary by the actual parties to the lease, the Carrieres and Occhipinti, as an inducement to make the loan.
_[nOn appeal Bank of Louisiana first argues that the lease was terminated either by the notice of default to Occhipinti which was never cured, Occhipinti’s abandonment or, alternatively, by the judicial sale. We find no merit in this argument. The decision of this Court as previously discussed specifically held the lease to still be in effect after the sale. The “law of the case” principle applies to all decisions of the appellate court, not merely those arising from the full appeal process. Hae Woo Youn v. Maritime Overseas Corp., 605 So.2d 187 (La.App. 5 Cir.1992), judgment set aside in part on other grounds 623 So.2d 1257 (La.1993); cert. den. Maritime Overseas Corp. v. Youn., — U.S. -, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). This court has already considered defendant’s argument on the termination of the lease by the actions of the Carrieres in their attempt at eviction of the bank from the premises and we will not revisit that ruling.
We note that the Bank of Louisiana, in its executory process, named Occhipinti, not the Carrieres, as the owner of the improvements, and the Process Verbal Deed resulting from the sheriffs sale transfers property from Oc-chipinti to the bank. That indicates that even the bank considered the leasehold estate to be owned by Occhipinti. Had the lease been terminated at that time as the bank now argues, ownership of the leasehold property would have vested in the Carrieres as provided for in the lease. They would have had ownership of the braiding subject to the mortgage.
The bank also makes the argument that the judicial sale terminated the ground lease pursuant to LSA-C.C. art. 2376 which provides that all inferior charges on property are discharged at a foreclosure sale. While we do not quarrel with the bank’s statement of the law, we do not find article 2376 *497 | ^applicable. That article applies to security interests on the property purchased. Defendant’s argument fails to consider that the lease itself was an asset foreclosed upon and purchased at the sheriff’s sale.
When the building and improvements were purchased by the bank at the sheriffs sale in the executory proceedings, the debt to the bank became extinguished by confusion. ‘When the qualities of obligee and obligor are united in the same person, the obligation is extinguished by confusion”. LSA-C.C. Art. 1903. However, that same reasoning does not apply to the lease. The parties to the lease were the Carrieres and Ocehipinti. The bank, although protected by the lease, was neither the obligee nor the obligor. Thus article 1903 is inapplicable to the lease. We conclude from these circumstances that the lease was in effect at the time it was purchased by the bank.
The bank argues, alternatively, that it did not exercise its option to “step into the shoes” of the lessee with the purchase of the lease. In support of its position the bank cites, Junior Money Bags, Ltd. v. Segal, 970 F.2d 1 (5th Cir.1992). In Junior Money Bags, defendant Segal acquired, at a judicial sale, a gondola and the ground lease of land and air space by the Mississippi River at New Orleans for the construction of a support tower and landing station used during the New Orleans World’s Fair. Segal sought to remove the gondola to move it to Texas. The lessor who owned the land sued to enforce the terms of the lease which would require the removal of the tower and landing support at Segal’s expense. The Court ruled that the mere purchase of the lease did not oblige Segal to remove the structures pursuant to the lease. In reaching that conclusion the court noted that Segal never claimed a right operate the gondola system under the lease or represented that the lease was still in effect.
11sWe find the facts in the ease at bar to be distinguishable from those in Junior Money Bags. Unlike the defendant in Junior Money Bags, who wished to move some of the property from the land, and had no intention to operate the structure on the lessor’s premises, the bank admits that it has refurbished the building and is using it as it was intended, as a restaurant.
The bank chose to foreclose on both assets held as collateral in the mortgage; the building and its improvements, and the lease. At the foreclosure sale the bank purchased both of the assets of the mortgage. By the terms of the lease the bank, as lender, had the option to take over the lease. We conclude that the bank, by purchasing the lease and the building, and by operating the property as a restaurant, exercised its option to “step into the shoes” of the lessee. When it did so it became bound as the lessee and can no longer take advantage of those articles in the lease governing the rights of the lender.
For the foregoing reasons, we affirm the judgment of the trial court in so far as it awards damages to the Carrieres for rent.
The Bank also asserts that the trial court erred in awarding 55,000.00 in attorney fees. The basis for the award was apparently a clause contained in the original lease which reads as follows:
5. LESSEE’S COVENANTS:
* * * * * ⅜
(F) To indemnify the LESSOR against all costs and expenses, including counsel fees, lawfully and reasonably incurred, in or about the premises, or in the defense of any action or proceeding, or in discharging the premises from any change (sic), lien, or encumbrance, on in obtaining possession after default of the LESSEE:
|14At trial, the plaintiffs introduced a lengthy document entitled, “Recapitulation of attorney’s fees” which indicates that the plaintiff was billed a total of $55,937.00 by the firm of Favret, Demarest, Russo & Lutkewitte. Entries are dated from August 31,1988 through February 21, 1994 and appear to cover costs of litigation, and research as well as attorney’s fees. No testimony was offered in connection with the offering of the documents into evidence; and the document was admitted subject to a defense reservation to examine the reasonableness of the charges should the court decide an award of attorney fees was appropriate. There is no indication in the record that the defense had the oppor *498 tunity to inquire into the reasonableness of the fees. Nor is there any explanation in the reasons for judgment for the amount awarded. Consequently, we vacate that portion of the judgment which awards attorney fees and remand the matter for consideration of the reasonableness of the attorney’s fees.
AFFIRMED IN PART, VACATED IN PART AND REMANDED.