# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 12-1406

**ST. LANDRY HOMESTEAD FEDERAL SAVINGS BANK**

**VERSUS**

**HUBERT VIDRINE, JR. ET AL.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 11-C-5310-A
HONORABLE JAMES P. DOHERTY JR., DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## JIMMIE C. PETERS
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Jimmie C. Peters, and Billy Howard Ezell, Judges.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

**Cliffe E. Laborde, III**
**Cliff A. LaCour**
**Laborde & Neuner**
**P.O. Box 52828**
**Lafayette, LA 70505-2828**
**(337) 237-7000**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
    **Hubert Vidrine, Jr., Tammy Vidrine, and**
    **Vidrine Estates, LLC**

**Gary T. Cornwell**
**The Cornwell Law Firm**
**12314 Hawthorne Drive**
**Montgomery, TX 77356**
**(936) 448-7789**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
**Hubert Vidrine, Jr., Tammy Vidrine, and**
**Vidrine Estates, LLC**

**James H. Gibson**
**David J. Ayo**
**Allen & Gooch**
**P. O. Box 81129**
**Lafayette, LA 70598-1129**
**(337) 291-1450**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
**St. Landry Homestead Federal Savings Bank**

**Michael D. Singletary**
**Singletary & Associates, APLC**
**P. O. Box 97**
**Opelousas, LA 70571-0097**
**(337) 407-8990**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
**St. Landry Homestead Federal Savings Bank**

**PETERS, J.**

Hubert Vidrine, Jr., Tammy J. Vidrine, and Vidrine Estates, LLC (the Vidrines) are both defendants and plaintiffs-in-reconvention in this litigation. They are before this court appealing the trial court judgment rendered in favor of the plaintiff and defendant-in-reconvention, St. Landry Homestead Federal Savings Bank (the Bank), granting its peremptory exception of no cause of action and dismissing their reconventional demand. For the foregoing reasons, we affirm the trial court judgment in part, reverse it in part, and remand the matter to the trial court for further proceedings consistent with this opinion.

## DISCUSSION OF THE PROCEDURAL RECORD

This litigation began on November 14, 2011, when the Bank filed suit against the Vidrines, asserting that they were in default on a commercial loan secured by a June 4, 2010 promissory note and mortgage. The Bank asserted in its petition that the Vidrines owed $2,194,635.65 on the promissory note at the time it filed suit, listed ten separate parcels of immovable property secured by the mortgage; and asserted that the Vidrines had failed to pay the September 4, 2010 installment on the promissory note. The Bank sought judgment for the amount owed, contractual attorney fees, and recognition of its liens on the ten parcels of immovable property listed in the mortgage.

The Vidrines filed a twenty-three-page response to the Bank's suit. In that response, they generally denied the Bank's assertions of liability; raised affirmative defenses; and asserted a reconventional demand against the Bank. In their reconventional demand, the Vidrines asserted that they were entitled to damages resulting from the actions of the officers and employees of the Bank based on fraud and duress, conduct prohibited by law and against public policy, detrimental reliance, breach of contract, and tortious interference with both their business and

contractual relationships. The Bank responded to the Vidrines' reconventional demand by answering the assertions and by filing peremptory exceptions of prescription, no right of action, and no cause of action.

Following a June 1, 2012 hearing, the trial court took the issues raised by the exceptions under advisement. On July 19, 2012, the trial court rendered written reasons for judgment sustaining the Bank's peremptory exception of no cause of action as to all claims asserted by the Vidrines on their own behalf and sustaining the Bank's peremptory exception of no right of action as to all claims asserted by the Vidrines on behalf of third parties. The trial court concluded that its ruling on the two exceptions rendered the prescription issue moot. The trial court executed a judgment to this effect on August 9, 2012, and thereafter, the Vidrines perfected this appeal. In their appeal, they raised eight assignments of error, all directed toward the grant of the exception of no cause of action:

A. The District Court erred in dismissing the Vidrines' reconventional demands without crediting all of the Vidrines' allegations, and in failing to construe the Vidrines' pleading in the light most favorable to the Vidrines, as required by law.

B. The Court erred in dismissing the Vidrines' reconventional demands for fraud and duress, erred in broadly concluding that "at least one, if not several, of the (elements of fraud) were not alleged sufficiently by the Vidrines in order to state a cause of action for fraud," and erred in holding that allegations of violence or threats are necessary to constitute legal duress.

C. The Court erred in dismissing the Vidrines' reconventional demand for Conduct Prohibited by Law and Against Public Policy upon the ground that 12 U.S.C. 4638 prohibited the claim.

D. The Court erred in misconstruing the Vidrines' reconventional demand for Detrimental Reliance, and in ignoring the factual allegations in the Vidrines' pleading which sufficiently alleged that reconventional demand.

E. The Court erred in dismissing the Vidrines' reconventional demand for Breach of Contract, which was based on the Bank's

2

breach of the Vidrine's [sic] written contracts (promissory notes and related mortgage agreements) with the Bank.

F. The Court erred in dismissing the Vidrines' reconventional demand for Tortious Interference with Contract upon the ground that it was barred by current Louisiana jurisprudence.

G. The Court erred in dismissing all of the Vidrines' reconventional demands upon the ground that La.R.S. 6:1121-1124 barred all of the Vidrines' reconventional demands.

H. The Court erred in dismissing the Vidrines' reconventional demands without allowing the Vidrines to amend their pleading to cure any perceived pleading insufficiency.

## OPINION

The trial court's grant of the peremptory exception of no right of action related to the right of the Vidrines to bring claims on behalf of other individuals similarly situated, and the Vidrines do not question that ruling on appeal. Instead, their complaints on appeal relate solely to the trial court's grant of the peremptory exception of no cause of action.

### Scope of Review

In *Ramey v. DeCaire*, 03-1299, pp. 7-8 (La. 3/19/04), 869 So.2d 114, 118-19, the supreme court stated the following regarding appellate review of an exception of no cause of action:

> A cause of action, when used in the context of the peremptory exception, is defined as the operative facts that give rise to the plaintiff's right to judicially assert the action against the defendant. *Everything on Wheels Subaru, Inc. v. Subaru South, Inc.*, 616 So.2d 1234, 1238 (La.1993). The function of the peremptory exception of no cause of action is to test the legal sufficiency of the petition, which is done by determining whether the law affords a remedy on the facts alleged in the pleading. *Id.* at 1235. No evidence may be introduced to support or controvert an exception of no cause of action. La. C.C.P. art. 931. Consequently, the court reviews the petition and accepts well-pleaded allegations of fact as true. *Jackson v. State ex rel. Dept. of Corrections*, 00-2882, p. 3 (La.5/15/01), 785 So.2d 803, 806; *Everything on Wheels Subaru*, 616 So.2d at 1235. The issue at the trial of the exception is whether, on the face of the petition, the

plaintiff is legally entitled to the relief sought. *Montalvo v. Sondes*, 93-2813, p. 6 (La.5/23/94), 637 So.2d 127, 131.

Louisiana has chosen a system of fact pleading. La. C.C.P. art. 854 cmt. (a); *Montalvo*[,] at p. 6, 637 So.2d at 131. Therefore, it is not necessary for a plaintiff to plead the theory of his case in the petition. *Kizer v. Lilly*, 471 So.2d 716, 719 (La.1985). However, the mere conclusions of the plaintiff unsupported by facts does not set forth a cause of action. *Montalvo*[,] at p. 6, 637 So.2d at 131.

The burden of demonstrating that the petition states no cause of action is upon the mover. *City of New Orleans v. Board of Com'rs of Orleans Levee Dist.*, 93-0690, p. 28 (La.7/5/94), 640 So.2d 237, 253. In reviewing the judgment of the district court relating to an exception of no cause of action, appellate courts should conduct a *de novo* review because the exception raises a question of law and the lower court's decision is based solely on the sufficiency of the petition. *Fink v. Bryant*, 01-0987, p. 4 (La.11/28/01), 801 So.2d 346, 349; *City of New Orleans*[,] at p. 28, 640 So.2d at 253. The pertinent question is whether, in the light most favorable to plaintiff and with every doubt resolved in plaintiff's behalf, the petition states any valid cause of action for relief. *City of New Orleans*[,] at p. 29, 640 So.2d at 253.

Following the guidance provided by the supreme court in *Ramey*, we must conduct a *de novo* review of the trial court's action. We accomplish this by first accepting the well-pleaded allegations of fact in the Vidrines' reconventional demand as true. Next, we must determine whether the trial court erred in concluding that these facts do not state a cause of action under the legal theories advanced by the Vidrines.

In their reconventional demand, the Vidrines asserted that their debt to the Bank stems from "a conspiracy carried out through a pattern of wrongful, willful, intentional and illegal conduct during the years 2002 through 2011, by, between and among the Bank and various Bank insiders and affiliated parties[.]"[1] The Vidrines identified the Bank's former President, Harold Fontenot, as the primary insider responsible for most of the offensive conduct giving rise to their

---

[1] Given the posture of the matter now before us, we need not consider whether a corporation can conspire with its officers and employees and despite the "conspiracy" language of the Vidrines' reconventional demand, we interpret their allegations to assert that the Bank is responsible for the acts or omissions of its agents. *See Aucoin v. Kennedy*, 355 F.Supp.2d 830 (E.D. La. 2004).

complaints, but further asserted that others acted to aid, assist, and encourage him in his activities; and that the offensive conduct continued after Mr. Fontenot's September 20, 2009 death. These other "insiders and affiliated parties" included the attorneys who represented the Bank during the time period of the offensive conduct as well as the Bank's directors, officers, and employees.[2]

The initial pattern of conduct begun by Mr. Fontenot consisted primarily of his use of his insider position for his own personal gain. After Mr. Fontenot's death, the pattern of conduct changed to an effort to cover up the earlier illegal activity "by fraudulently misleading, deceiving and coercing [the Vidrines] . . . into either paying off or consolidating the illegally extended loans, forfeiting their collateral, and/or moving their banking business elsewhere, all at the greatest possible savings to the Bank and without regard to (and/or in order to achieve) related losses by [the Vidrines]." The Vidrines claim that the insiders and affiliated parties concealed these actions from the federal regulatory authorities and carried out their objectives by:

a.  Extending loans to uncreditworthy customers and engaging in other "unsafe and unsound" banking practices prohibited by federal law.

b.  Putting their own, personal self-interests above those of the Bank, and thereby defrauding both the Bank's owners, its customers and regulatory authorities, by concealing and failing to disclose:

(1)  conflicts of interest between themselves, personally, and the Bank's owners,

(2)  conflicts of interest between themselves, personally, and the public interests (including that of the FDIC), and

---

[2] The names of some of the individuals named in the reconventional demand appear in connection with transactions involving parties other than the Vidrines, and their involvement in this litigation was resolved through the granting of the peremptory exception of no right of action. That being the case, we will not specifically identify them in this litigation.

(3)   conflicts of interest between themselves, personally, and the customers to whom they gave advice, guidance, and directives under the guise of befriending and "helping" those customers.

c.   Advising, enticing, encouraging, pressuring and when necessary coercing customers to purchase and/or develop property, with the purchase money typically "funded" by bank loans at 100% of the purchase price and/or on other favorable terms, often without evidence of credit worthiness, and often coupled with promises that the Bank would help the customer to quickly flip the property again, all in order to reap personal profits for Bank insiders and affiliated parties, get bad loans off of the Bank's books, and conceal bad loans from federal regulators – in effect, a Ponzi scheme perpetrated through a succession of unsound, unsafe, and otherwise unlawful loans.

d.   Using bank funds to "entice" customers into purchasing property owned by (and thereby reap profits for) bank insiders and affiliated parties.

e.   Advising, enticing, encouraging, pressuring and when necessary coercing less sophisticated bank customers into borrowing from the Bank to make unnecessary, unwise and unsound investments, all in order to benefit Bank insiders and affiliated parties, and/or to benefit the Bank's larger and "more sophisticated" customers.

f.   Fraudulently manipulating appraised values on property, sometimes inflated to justify loans, and sometimes deflated to lower equity values and thereby facilitate "defaults" and foreclosures.

g.   Intentionally breaching contracts, terminating long-standing banking practices historically relied upon by customers in conducting their businesses, and declaring alleged "loan defaults" against customers who the Bank perceived would *thereby become* financially disadvantaged and unable to defend themselves from such conduct.

The reconventional demand contains descriptions of specific factual scenarios the Vidrines faced in their dealings with the Bank which support their conspiracy allegations. For the limited purpose of this review, we accept these factual assertions as true, and whether they are sufficient to state a cause of action against the Bank as a matter of law is the issue before us. We summarize as

6

follows the reconventional demand assertions which we find pertinent to this phase of the litigation:

## BACKGROUND

The Vidrines' relationship with the Bank began in 2001 through a personal relationship between Mr. Vidrine and Mr. Fontenot, who was both the Bank's President and Chairman of the Board of Directors. Mr. Fontenot became a regular customer at the Vidrines' café that year, personally owned immovable property close to the Vidrines' café, and befriended Mr. Vidrine at a time when he needed a friend because he was under a federal indictment for Environmental Protection Agency (EPA) violations. This friendship grew to a point that the Vidrines "believed that [they] could trust and rely on [Mr. Fontenot's] good intentions and advice."

## MARCH 28, 2003 TRANSACTION

Early in the friendship, Mr. Fontenot advised Mr. Vidrine to invest in land, but Mr. Vidrine replied that he "[had] too many legal bills." However, in March of 2002, Mr. Fontenot informed Mr. Vidrine that he had just purchased 36.8 acres of immovable property situated across the street from the Vidrines' business establishments from an individual named Robert Sullivan. Mr. Fontenot offered the property to Mr. Vidrine for the price of $150,000.00 and suggested that in selling the property to him, he would be making Mr. Vidrine "the deal of a lifetime." As a further incentive, Mr. Fontenot orally promised Mr. Vidrine that if he wished to develop the property, the Bank would provide one hundred percent of the financing for the development. The Vidrines executed a purchase agreement for the property on March 29, 2002, and finalized the sale on March 28, 2003. Immediately thereafter, the Vidrines began planning the development of a subdivision on the 36.8 acres.

The Vidrines later discovered that Mr. Sullivan, who was the paramour of Mr. Fontenot's sister, had purchased the 36.8 acres on March 11, 2002, through his corporation, Dusty Morgan Corporation, from the estate of Mr. Fontenot's aunt, for $72,000.00. On March 23, 2002, or six days before they and Mr. Fontenot executed the purchase agreement, the corporation transferred the property to Mr. Fontenot for the same $72,000.00 consideration. Thus, six days after acquiring title to the 36.8 acres, Mr. Fontenot caused the Vidrines to execute the purchase agreement which assured himself of a $78,000.00 profit within one year as well as capital gains treatment of the profit. Mr. Fontenot was able to reap this benefit because of his ability to obtain favorable financing arrangements for the Vidrines from the Bank.

7

## AUGUST 19 AND 22, 2003 TRANSACTIONS

Subsequent to the transfer of the 36.8 acres, Mr. Fontenot arranged for the Bank to loan the Vidrines additional sums to settle their financial matters with other creditors and consolidate everything within the Bank. This included a $600,000.00 loan consummated on August 19, 2003, and an additional $129,212.00 loan consummated on August 22, 2003. As a part of the consolidation process, Mr. Fontenot required that the Vidrines provide security for the loan in the form of a pledge of their business property, which consisted of a store, restaurant, and real estate. At this time, Mr. Vidrine was still under the cloud of a federal indictment, and was facing a possible five-year sentence and millions of dollars in fines if convicted. Because of his personal situation, he considered his ability to repay these loans to be "highly questionable."

## FEBRUARY 6 AND OCTOBER 8, 2004 TRANSACTIONS

On September 18, 2003, the pending federal charges against Mr. Vidrine were dismissed. Soon thereafter, another opportunity became available to the Vidrines when they learned that two tracts of immovable property located across the street from their business location were for sale. The Vidrines had long wanted to own this property and approached Mr. Fontenot to obtain financing. The Bank financed the purchase of one of the two tracts, a 59.3 acre tract, on February 6, 2004, for the sum of $205,700.00. However, several months later when they approached Mr. Fontenot about the Bank financing the $70,125.00 purchase price for the second tract, an eleven acre tract, Mr. Fontenot refused to consider that transaction unless the Vidrines also purchased an additional 26.4 acres originally belonging to his mother's estate for $112,000.00. The 26.4 acres had previously been sold to another individual and was on the Bank's records as a bad loan. Although Mr. Vidrine complained to Mr. Fontenot that the property was overpriced and in a bad location, he agreed to include the parcel in exchange for Mr. Fontenot's promise that the Bank would finance one hundred percent of the purchase price of both parcels. The October 8, 2004 transaction transferring title to both parcels to the Vidrines resulted in a new loan from the Bank in the amount of $183,000.00.

At this point in time, the Vidrines' indebtedness to the Bank totaled approximately $900,000.00, but their business income provided sufficient funds to easily meet this and their other financial obligations. However, their situation severely limited any future business flexibility because the Bank held a lien against every asset owned by the Vidrines except Hubert and Tammy Vidrine's family home. That being the case, the Vidrines felt they had no choice but to follow the Bank's directions as expressed by Mr. Fontenot.

## JIM WALTER HOMES 2006 TRANSACTION

In 2006, the Jim Walter Homes business organization approached the Vidrines and asked that they consider a plan for developing the 59.3 acre tract the Vidrines had purchased on February 6, 2004. The plan called for the Vidrines to develop the infrastructure on the property over a nine-month period, in exchange for Jim Walter Homes' agreement to purchase three lots per month for thirty-six months at the price of $15,000.00 each, once the infrastructure was completed. This would result in a total payout to the Vidrines of $2,250,000.00.

Mr. Vidrine met with Mr. Fontenot and Charles Boagni, the Bank's attorney at that time, to discuss the project and seek financing. Mr. Fontenot caused the Bank to approve a $900,000.00 loan to the Vidrines for the required infrastructure work, and the Vidrines retained Mr. Boagni to personally represent them in the negotiation of the contract with Jim Walter Homes. The Vidrines trusted Mr. Boagni to protect their interest in the preparation of the contract. The final executed contract had an effective date of May 9, 2006, but also contained a right of cancellation in favor of Jim Walter Homes allowing it to withdraw from the contract on or before July 7, 2006. Trusting Mr. Boagni to protect their interests, neither Hubert nor Tammy Vidrine read the contract. However, Mr. Boagni failed to advise them of the right of cancellation, and they only became aware of its existence when, on July 7, 2006, Jim Walter Homes exercised its right to withdraw from the contract. At that time, the Vidrines were still working on the infrastructure project. A few days after withdrawing from the contract, Jim Walter Homes declared bankruptcy.

When Mr. Vidrine informed Mr. Fontenot that without the Jim Walter Homes income he could not repay the loan, Mr. Fontenot instructed him to continue the development activity because the loan had already been approved by the Bank. Mr. Fontenot told Mr. Vidrine, "Don't worry, I will sell it for you." Believing they had no choice, the Vidrines continued with the development activity. On August 11, 2006, they signed an additional note to the Bank for $900,000.00. This transaction added an additional $7,400.00 to the Vidrines' monthly debt structure and became more than their business interests could afford.

## APRIL 5, 2007 TRANSACTION

The pressure from the Bank did not cease when the Vidrines reached their debt limit. In April of 2007, Mr. Fontenot requested that the Vidrines purchase a fifty-acre tract of land which the Bank had financed for Larry Leger, but which was in a delinquent status. The Bank had financed Mr. Leger's purchase of the property from Robert

Sullivan and Mr. Fontenot's sister at the request of Mr. Fontenot. The purpose of this transfer was to remove another delinquent loan from the Bank's books, but after the transfer, Mr. Leger made no payment on the indebtedness to the Bank. On April 5, 2007, Mr. Fontenot called Mr. Vidrine and told him, "the auditors were in the Bank, and that [Mr. Vidrine] needed to come to the Bank right away. [Mr.] Fontenot said, 'Pick up [Mrs. Vidrine], and come now; I have no one else to help me; I promise that I will sell the property for you as soon as possible.'" The Vidrines did as Mr. Fontenot asked and purchased the property that same day for $156,000.00. The Bank financed one hundred percent of the purchase price, and this transaction raised the monthly debt obligation of the Vidrines by an additional $800.00.

## MAY 22, 2009 TRANSACTION

In 2008, and with their repayment capacity past their limits, the Vidrines attempted to surrender the two subdivisions and the last-purchased fifty-acre tract to the Bank, in an effort to save their business. Although Mr. Vidrine was aware that it had done so for numerous other customers, Mr. Fontenot informed Mr. Vidrine that the Bank could not accept the return of the property. With Mr. Fontenot's permission, Mr. Vidrine changed the subdivision restrictions to allow mobile homes and reduced the subdivision's lot prices. These business decisions accelerated the sale of the lots and the revenue generated from these sales was initially applied to the indebtedness.

In early 2009, the Vidrines informed Mr. Fontenot that they intended to file a Chapter-11-bankruptcy action and reorganize their financial matters. Mr. Fontenot talked them out of this action and loaned them an additional $175,000.00. As security for this loan, Hubert and Tammy Vidrine mortgaged their last asset, their family home, to the Bank. This transaction occurred on May 22, 2009.

## JUNE 4, 2010 TRANSACTION

Sometime prior to the May 22, 2009 transaction, Mr. Fontenot was diagnosed with cancer, began treatment, and was seldom available to customers. Kathy LeJeune, the Bank's Vice President, began handling the Vidrine accounts and, in her meetings with Mr. Vidrine, constantly criticized Mr. Fontenot for the loans he had made to the Vidrines. Ms. LeJeune described herself as the "hatchet lady," and seemed proud that the Bank was becoming known for its high rate of foreclosures. She cancelled the long-standing privilege granted to the Vidrines by Mr. Fontenot of receiving same-day credit for their deposits, and this action "disrupted the timing of their cash flow, destroyed [their] income from customer check cashing services, and resulted in tens of thousands of dollars in bounced check charges."

Ms. LeJeune criticized everything the Vidrines were doing to solve their existing debt service problems, even though the Bank was primarily responsible for their financial dilemma. Concerning the Vidrines' decision to reduce the sale price for the subdivision lots, she found this to be a bad business approach despite the fact that the reduced price not only increased the sale of lots to the immediate advantage of the Bank (given the fact that all of the proceeds were applied to the Vidrines' debt at the Bank), but sale of all the lots at the reduced price would pay the Bank debt in full and cause the Vidrines to receive a satisfactory profit over and above the indebtedness.

After Mr. Fontenot's death on September 20, 2009, Ms. LeJeune intimated that she intended to put the Vidrines and Mr. Fontenot's other customers out of business. She informed them that "I have a list with 43 names on it, loans that [Mr. Fontenot] made to his friends. You're on it, and I'm going to get rid of all of them." To that end, the Bank stopped applying the subdivision revenue derived from sale of the individual lots to their note payments and refused them any portion of the revenue for their personal use. This change in policy, together with the non-sufficient-funds (NSF) charges rising to a level of thousands of dollars per month completely absorbed the net revenue from the Vidrines' store and café businesses such that they had no source of income sufficient to cover the monthly notes.

In April of 2010, Mr. Vidrine met with Kip Bertrand, the Bank's new president, to request help. Mr. Bertrand agreed to deposit the revenue from the next three lot sales into their account, but Ms. LeJeune diverted the third deposit to the indebtedness. When Mr. Vidrine called Ms. LeJeune's attention to Mr. Bertrand's promise, she simply responded that it was "[t]oo late; I took it and put on the note." Ms. LeJeune's action resulted in more bounced checks and an increase in NSF charges. The Bank's actions reminded Mr. Vidrine that prior to his death, Mr. Fontenot told him, "They will destroy all of my friends as soon as I die."

The next month after Mr. Bertrand made his promise to deposit the three revenue sources into the operating account, Ms. LeJeune summoned Mr. Vidrine to a meeting at the Bank with her and another Bank employee, Gene Kidder. In that meeting, the two Bank employees informed him that they "had a plan to save him" by consolidating all of the indebtedness into one note at a lower interest rate. When he asked whether the Bank would return to the previous policy of crediting the subdivision sales to the note, he was informed that would be the new policy under the single note. He then inquired about a line of credit to stop the NSF charges, and they responded, "We'll see how much we can give you after the appraisal."

After the fact, the Vidrines discovered that the underlying purpose of the new plan was not to help them, but to cause them to default on this consolidation loan so the Bank could seize all of their

11

assets through litigation. To that end, the Bank instructed its appraiser, John Foti, to prepare an appraisal of their property which greatly deflated its value by millions of dollars. It instructed Mr. Foti to appraise the Vidrines' business as if it were a vacant and abandoned building, and to ignore the fact that the business was producing $4,000,000.00 per year in revenue. The Bank also instructed Mr. Foti to ignore the amount received from the current subdivision lot sales activity and to appraise that property at an arbitrary value of less than fifty percent of the value for which it was being sold.

Based on this flawed appraisal, the Bank classified the Vidrines as a high-risk customer with a loan-to-value ratio of over seventy percent. Despite this classification, the Bank allowed the Vidrines to consolidate all of their indebtedness into one note and that note was executed on June 4, 2010. This increased their monthly payment to $15,000.00 and left them with few financial choices. In fact, the financial classification arising from the flawed appraisal gave the Bank the excuse it needed to reject the requested line of credit. It also allowed the Bank to maintain its source of income from the NSF charges. Equally important, it gave the Bank justification for refusing to apply future loan payments to their monthly obligations, thereby using the misapplication as an excuse for declaring that they were in default.

### EVENTS SUBSEQUENT TO THE JUNE 4, 2010 TRANSACTIONS

The final blow occurred just two months later when, in August of 2010, the Vidrines were called to the Bank for a meeting with Mr. Bertrand, Ms. LeJeune, Mr. Kidder, and Harold Carrier, the Chairman of the Bank's Board of Directors. At that meeting, the Vidrines were informed that they could no longer use the subdivision lot sales to make monthly payments on the consolidation note and that they must generate the $15,000.00 per month obligation from other sources of income. When the Vidrines expressed their inability to meet this burden, the officials of the Bank responded, "Too bad, you'll have to take bankruptcy, or move your accounts to another bank." Thereafter, even when they were able to make their payments, the Bank failed to credit those payments to their note, placing them in default.

In early 2011, in a final effort to meet their financial obligations to the Bank, the Vidrines placed the subdivision property on the market. They were in the process of closing a sale of the property for $500,000.00 when Ms. LeJeune intervened and caused the sale to fall through. Ms. Lejeune falsely informed the prospective buyer that the Bank was foreclosing on the property and *that he [the buyer]should look at purchasing other property that the Bank had for sale instead.*" [Emphasis in the reconventional demand]. It was not until November 14, 2011, that the Bank instituted this action. The Vidrines describe Ms. LeJeune's action in causing the sale to fall through as "an act of

maliciousness, carried out with spite and ill will, the sole object of which was to harm the Vidrines."

Having summarized the factual allegations of the Vidrines, and accepting these assertions as true for the purpose of considering the exception of no cause of action, we now address their arguments on appeal, but not necessarily in the order they appear in the assignments of error.

### *Louisiana Credit Agreement Act*

Although the trial court considered each of the asserted causes of action individually, it additionally found that the application of the Louisiana Credit Agreement Act (La.R.S. 6:1121 through La.R.S. 6:1124) precludes the Vidrines from asserting any of the claims for relief raised in their reconventional demand. Before considering the arguments on the individual factual claims, we will discuss the effect this legislative enactment has on the asserted facts in general.

By Acts 1989, No. 531, the Louisiana Legislature enacted Chapter 16, Title 6 of the Louisiana Revised Statutes, titled "**CREDIT AGREEMENTS— WRITING REQUIREMENTS,**" and which has been generally referred to by the jurisprudence as the Louisiana Credit Agreement Act (hereinafter sometimes referred to as the "Act"). The Historical Note following La.R.S. 6:1121 stated that the purpose of the legislation was "to provide that certain credit agreements be in writing; to define such agreements; and to provide for related matters."

Two years later, by Acts 1991, No. 581, the Louisiana Legislature added La.R.S. 6:1124 to Chapter 16, Title 6. The Historical Note following this statute stated that "[t]his Act is deemed to be clarifying in nature and shall apply to prior and now existing relationships and transactions involving financial institutions." The four statutes comprising Chapter 16, Title 6 read as follows:

13

## La.R.S. 6:1121.  Definitions

For purposes of this Chapter, the following terms shall have the following meanings:

(1)  "Credit agreement" means an agreement to lend or forbear repayment of money or goods or to otherwise extend credit, or make any other financial accommodation.

(2)  "Creditor" means a financial institution or any other type of creditor that extends credit or extends a financial accommodation under a credit agreement with a debtor.

(3)  "Debtor" means a person or entity that obtains credit or seeks a credit agreement with a creditor or who owes money to a creditor.

(4)  "Financial institution" means a bank, savings and loan association, savings banks, or credit union authorized to transact business in this state.

## La.R.S. 6:1122.  Credit agreements to be in writing

A debtor shall not maintain an action on a credit agreement unless the agreement is in writing, expresses consideration, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor.

## La.R.S. 6:1123.  Actions not considered agreements

A.  The following actions shall not give rise to a claim that a new credit agreement is created, unless the agreement satisfies the requirements of R.S. 6:1122:

(1)  The rendering of financial or other advice by a creditor to a debtor.

(2)  The consultation by a creditor with a debtor.

(3)  The agreement of a creditor to take or not to take certain actions, such as entering into a new credit agreement, forbearing from exercising remedies under a prior credit agreement, or extending installments due under a prior credit agreement.

B.  A credit agreement shall not be implied from the relationship, fiduciary, or otherwise, of the creditor and the debtor.

**La.R.S. 6:1124. No implied fiduciary obligations**

No financial institution or officer or employee thereof shall be deemed or implied to be acting as a fiduciary, or have a fiduciary obligation or responsibility to its customers or to third parties other than shareholders of the institution, unless there is a written agency or trust agreement under which the financial institution specifically agrees to act and perform in the capacity of a fiduciary. The fiduciary responsibility and liability of a financial institution or any officer or employee thereof shall be limited solely to performance under such a contract and shall not extend beyond the scope thereof. Any claim for breach of a fiduciary responsibility of a financial institution or any officer or employee thereof may only be asserted within one year of the first occurrence thereof. This Section is not limited to credit agreements and shall apply to all types of relationships to which a financial institution may be a party.

Clearly, the Bank is a "creditor" as defined in La.R.S. 6:1121(2), and the Vidrines are "debtor[s]" as defined in La.R.S. 6:1121(3). It is equally clear that the Bank and the Vidrines entered into a number of "credit agreements" as that term is defined in La.R.S. 6:1121(1), during the years that a creditor/debtor[s] relationship existed between the litigants. These qualify as contracts as that term is defined in La.Civ.Code art. 1906.

The Louisiana Supreme Court first addressed the application of the Louisiana Credit Agreement Act to the creditor/debtor relationship in *Whitney National Bank v. Rockwell*, 94-3049 (La. 10/16/95), 661 So.2d 1325. This case arose from a situation where, in response to the lending bank's suit on a promissory note, the debtor asserted a reconventional demand based on his claim that the lending bank breached its oral promises to accept interest-only payments for an initial period after the loan was made and then to grant a term of years for repayment in monthly installments.[3] In concluding that the Act precluded the debtor's cause of action on the oral promise, the supreme court stated:

---

[3] The terms of the promissory note provided for repayment in full within seventy-six days from the date of its execution.

> [T]he Bank's alleged breach of the oral agreement by demanding payment in full in accordance with the terms of the note, is exactly the situation that the Legislature contemplated in enacting the credit agreement statute. The very purpose of the statute was to prohibit a debtor's action for damages based on the breach of an alleged oral agreement to forebear repayment or to make financial accommodations.

*Id.* at 1332.

The impact of this statute on other causes of action arising from a creditor/debtor relationship was addressed by the Louisiana Supreme Court, in *Jesco Construction Corp. v. Nationsbank Corp.*, 02-57, p. 1 (La. 10/25/02), 830 So.2d 989, 990, wherein it responded affirmatively to the question certified by the United States Fifth Circuit of Court of Appeal, of "whether the Louisiana Credit Agreement Statute precludes all actions for damages arising from oral credit agreements, regardless of the legal theory of recovery." *Jesco Construction Corp. v. NationsBank Corp.*, 278 F.3d 444, 448 (5th Cir. 2001). The facts before the supreme court in that matter were summarized by the majority as follows:

> This matter arises from a failed loan application process in which Jesco Construction Corporation ("Jesco") sought a $17.7 million loan from Bank of America Commercial Finance Corporation ("BACF"). Jesco sought to obtain the loan in order to purchase the stock of King Fisher Marine Services.

> The parties differ on why Jesco terminated the loan application process prior to its completion. Jesco contends that the appraisals were done; terms negotiated; and closing documents circulated; and that BACF indicated on October 23, 1997, that the loan was approved; that the transaction would be completed by the following Friday; and that the loan was a "done deal." On the other hand, BACF claims that appraisals of King Fisher revealed that it was worth less than BACF's letter of interest required. An unrelated third party eventually bought the King Fisher stock for $2 million more than the Jesco offer.

> Jesco originally filed the matter in the Civil District Court for the Parish of Orleans in April 1998, alleging breach of contract, detrimental reliance, negligent misrepresentation, unfair trade practices, breach of the duty of good faith and fair dealing, promissory and equitable estoppel, and breach of fiduciary duty.

*Jesco*, 830 So.2d at 990-91 (footnote omitted).

The matter was removed to the Federal District Court for the Eastern District of Louisiana, where BACF obtained a summary judgment dismissing all of Jesco's causes of action based on the application of the Louisiana Credit Agreement Act. In responding to the certified question, the supreme court concluded that "all actions (or causes of action or theories of recovery) based upon an oral agreement to lend money are barred by the La.Rev.Stat. 6:1122." *Id.* at 992. In Jesco's case, the supreme court found that "[t]he basis for each and every one of these causes of action is the failure by BACF to make a loan based upon an alleged oral credit agreement." *Id.* Such causes of action were barred, according to the supreme court, because "the primary purpose of credit agreement statutes is to prevent potential borrowers from bringing claims against lenders based upon oral agreements." *Id.*

In his dissent, Chief Justice Calogero directed the majority to the opinion in *Whitney*, wherein the supreme court concluded that "[t]he Louisiana statute does not address, one way or the other, any protection of unsophisticated borrowers or any exemption based on fraud, misrepresentation, promissory estoppel or other equitable theory." *Id.* at 992 (Calogero, C.J., dissenting) (alteration in original). He went on to state what he considered to be the result of the majority opinion:

> The majority opinion will allow lenders to freely defraud unsophisticated borrowers. Lending institutions like [the defendant] should not be allowed to commit misrepresentation and fraud, and engage in unfair trade practices to the detriment of a [sic] innocent borrowers who sustain damage because of their good faith. Such a result surely extends the reach of the Louisiana Credit Agreement Statute beyond its plain language. Accordingly, I would hold that the Louisiana Credit Agreement Statute forecloses only a borrower's breach of contract action on an oral credit agreement.

*Id.* at 944.

The supreme court revisited the cause of action issues raised by the Act in *King v. Parish National Bank*, 04-337 (La. 10/19/04), 885 So.2d 540, and, with Chief Justice Calogero again dissenting, reached a decision similar to that in *Jesco*. In *King*, the debtor had consolidated his individual loans into one large promissory note secured by mortgages over various immovable properties. According to the debtor, a bank loan officer assured him that the restructuring of the indebtedness would not impair or jeopardize his personal and financial welfare as long as he kept his obligations to the bank current. The consolidation occurred in March of 1990, and in early 1993, the lending bank informed the debtor that the maturity date of the note was approaching and that the bank would require appraisals of his collateral as well as other financial information before the maturity date. If the debtor failed to make the requested information available, the bank expected the loan to be paid in full on the maturity date. Subsequent appraisals arranged for by the lending bank through a nephew of its president established that the note was secured by insufficient collateral. Based on this information, the lending bank refused to renew the loan on its current terms and security. Ultimately, in order to avoid bankruptcy, the debtor transferred some of his security to the bank as *dations en payment* and was left with a debt less than one third of the original debt.

The debtor then brought suit against the bank and other parties asserting that the bank's actions during the renegotiation of his prior loan consolidation were done in bad faith giving rise to "several causes of action in tort, breach of quasi-contractual obligations, error, fraud, and duress based on defendants' actions and roles surrounding the 1990 loan consolidation and 1993 workout." *Id.* at 543. The matter finally reached the supreme court when it "granted certiorari to consider whether the Louisiana credit agreement statutes, La. R.S. 6:1121 *et seq.*, preclude

18

all of King's causes of action regarding his 1993 workout with PNB against the defendants." *Id.* at 545. Answering that question in the affirmative by relying on its opinion in *Jesco*, the supreme court stated:

> In *Jesco Construction Corp. v. Nationsbank Corp.*, 02-0057, p. 4 (La.10/25/02), 830 So.2d 989, 992, this court held that the Louisiana Credit Agreement Statute precludes *all actions* for damages arising from oral credit agreements, regardless of the legal theory of recovery asserted. This court recognized that allowing debtors to bring actions predicated upon oral agreements to lend money, but on theories other than breach of contract, thereby circumventing the writing requirement of the credit agreement statute, would "thwart the intent of the legislature and render the entire statute meaningless." *Id.* In *Jesco*, the plaintiff's petition asserted actions for breach of contract, detrimental reliance, negligent misrepresentation, unfair trade practices, breach of the duty of good faith and fair dealing, promissory and equitable estoppel, and breach of fiduciary duty. *Id.* Since the basis for each cause of action was the failure by the creditor to make a loan based upon an alleged oral credit agreement, this court held that each and every cause of action in the petition was barred by La. R.S. 6:1122. *Id.*

*Id.* at 547 (footnote omitted).

The supreme court went on to state:

> Essentially, King is asserting an implied agreement between PNB and himself not to require appraisals on mortgaged property in order to secure credit based on the previous relationship and actions of the two parties. Such an agreement, based on PNB and King's previous commercial relationship, is expressly precluded by La. R.S. 6:1123(B) and is not enforceable without a written agreement.

*Id.* at 548.

Once again dissenting from the majority's opinion on this issue, Chief Justice Calogero reiterated his opinion from his dissent in *Jesco* that La.R.S. 6:1124's language only applies to actions based on credit agreements which have not been reduced to writing. Therefore, he reiterated that it "does not preclude causes of actions based on fraud, misrepresentation, promissory estoppel or other equitable theories that are alleged in this case." *Id.* at 550 (Calogero, C.J., dissenting in part).

19

In *Whitney*, *Jesco*, and *King*, the transactions at issue directly involved credit agreements as defined in La.R.S. 6:1121(1), and the general rule of law established by these three decisions is the affirmative answer to the question certified to the supreme court by the United States Fifth Circuit Court of Appeal in *Jesco*. The issue in *Whitney* and *King* involved oral promises of future actions or inactions purportedly made by the financial institution at the time the written credit agreement was executed, while the issue in *Jesco* involved oral promises and/or representations purportedly made in advance of consummating a written credit agreement.

In rendering written reasons for judgment in favor of the Bank, the trial court did not limit its ruling to include only the oral promises and representations made to the Vidrines by Mr. Fontenot and the other Bank officials in relation to the various credit agreements, but concluded that all other allegations made by the Vidrines fell within the scope of the protections provided to financial institutions by the Louisiana Credit Agreement Act. We find this expansive reading of the decisions in *Whitney*, *Jesco*, and *King* to be in error. We do agree, however, that in accepting the facts of the reconventional demand, the trial court correctly determined that the Vidrines have no cause of action and are thereby precluded from pursuing any claims for damages arising from the statements, representations, or promises made to them by Mr. Fontenot or any other Bank official before or in conjunction with the execution of the various credit agreements set forth in the reconventional demand. Except as modified hereafter, this would specifically apply to any oral promise or representation made by Mr. Fontenot in relation to the credit agreements executed on March 28, 2003, October 8, 2004, August 11, 2006, April 5, 2007, and May 22, 2009, or made by any other Bank official in relation to

the June 4, 2010 credit agreement.  However, we do not interpret the supreme court's decisions in *Whitney*, *Jesco*, and *King* to establish a rule of law that the Louisiana Credit Agreement Act renders a financial institution immune from any and all liability arising from its business operations, including business operations that occur outside the parameters of a credit agreement as defined in La.R.S. 6:1121(1).  Thus, we must now address each of those factual scenarios to determine whether any set forth a cause of action under the theories advanced by the Vidrines.

### Fraud

The first cause of action asserted by the Vidrines in their reconventional demand is that of fraud.  As set forth in La.Civ.Code art. 1927, "[a] contract is formed by the consent of the parties established through offer and acceptance." However, that consent necessary for the formation of a contract can be vitiated by fraud or duress.  La.Civ.Code art. 1948.

Fraud is defined in La.Civ.Code art. 1953 as "a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other.  Fraud may also result from silence or inaction."  Thus, in order to prove fraud on the part of the Bank, the Vidrines must prove:

> (1) a misrepresentation, suppression, or omission of true information;
>
> (2) the intent to obtain an unjust advantage or to cause damage or inconvenience to another; and (3) the error induced by a fraudulent act must relate to a circumstance substantially influencing the victim's consent to (a cause of) the contract.  In addition to the intent to defraud or gain an unfair advantage, there must be a resulting loss or damage.

*Williams v. Interstate Dodge, Inc.*, 45,159, pp. 7-8 (La.App. 2 Cir. 4/14/10), 34 So.3d 1151, 1155-56 (citations omitted).

21

While La.Civ.Code art. 1954 provides that "[f]raud does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill[,]" that same Article provides that "[t]his exception does not apply when a relation of confidence has reasonably induced a party to rely on the other's assertions or representations." Fraud may be proven by circumstantial evidence, so long as proof is by a preponderance of the evidence. La.Civ.Code art. 1957.

In their reconventional demand, the Vidrines assert that the fraud perpetrated on them consisted of a pattern which "consisted of both misrepresentations and suppressions of the truth, and both actions and silence and inactions, all with the intention to obtain an unjust advantage for the Bank and to cause a loss or inconvenience to [them]." The Vidrines further assert that the "purported friendship extended [to them] by . . . Harold Fontenot created a relation of confidence that reasonably induced [them] to rely on the Bank's assertions and representations to their detriment."

With regard to the March 28, 2003 transaction, the only fraudulent act committed in association with the negotiation process involved Mr. Fontenot's failure to advise the Vidrines that the transaction would involve a $78,000.00 personal profit to him over a six-day period. He suppressed and omitted personal information with the intent to obtain an unjust advantage over the Vidrines. This act of suppression and omission did relate to a circumstance which, if known to the Vidrines, would have substantially influenced their consent to the transaction, and they sustained a loss in that they purchased immovable property at twice its value. However, nothing in the accepted facts establish that the Bank had any knowledge of Mr. Fontenot's fraudulent action. That being the case, the accepted facts do not

22

establish a cause of action against the Bank for the actions of Mr. Fontenot outside the course and scope of his relationship with the Bank. La.Civ.Code art. 2320; *Macaluso v. Travelers Cas. and Sur. Co.*, 10-1478 (La. 2/23/11), 59 So.3d 454. Thus, the trial court did not err in concluding that the Vidrines failed to state a cause of action against the Bank on these facts.

With regard to the facts surrounding the August 19, 2003, August 22, 2003, February 6, 2004, October 8, 2004, April 5, 2007, May 22, 2009, and June 4, 2010 transactions, we note that the pattern of fraudulent activity asserted by the Vidrines falls within the negotiation process giving rise to the various credit agreements entered into by the Vidrines. Any cause of action for fraud with regard to these pre-credit-agreement negotiations is precluded by the Louisiana Credit Agreement Act. Therefore, we find no error in the trial court's determination that the Vidrines failed to state a cause of action for fraud as it pertains to these transactions.

Additionally, we find no error in the trial court's determination that the Vidrines failed to state a cause of action against the Bank for fraud as it pertains to the Jim Walter Homes transaction. The Vidrines' complaint is primarily against Mr. Boagni in his capacity as their personal lawyer, not as the lawyer for the Bank.

### *Duress*

Louisiana Civil Code Article 1959 provides that in a contractual relationship, "[c]onsent is vitiated when it has been obtained by duress of such a nature as to cause a reasonable fear of unjust and considerable injury to a party's person, property, or reputation." Additionally, the "[a]ge, health, disposition, and other personal circumstances of a party must be taken into account in determining reasonableness of the fear." *Id.* However, the "threat of doing a lawful act or a threat of exercising a right does not constitute duress. A threat of doing an act that

23

is lawful in appearance only may constitute duress." La.Civ.Code art. 1962. Additionally, the fear of economic deprivation has been recognized as a species of duress sufficient to vitiate consent by the Louisiana Supreme Court. *Wolf v. La. State Racing Comm'n*, 545 So.2d 976 (La.1989); *Martco P'ship v. Frazier*, 01-72 (La.App. 3 Cir. 6/6/01), 787 So.2d 1196.

The Vidrines do not state with any specificity the act or acts of the Bank that give rise to duress. Instead, they seem to assert in their reconventional demand that the same facts which gave rise to the claim of fraud also give rise to the claim of duress. After applying the Louisiana Credit Agreement Act to preclude any claim for duress based on the pre-credit-agreement negotiations, we are still left with the actions of Ms. LeJeune from the time of the beginning of Mr. Fontenot's cancer struggle to the April 2010 meeting, which began the negotiation process for the June 4, 2010 transaction, and the actions of the Bank officers and directors that occurred after the August 2010 meeting. We find that these facts do state a cause of action for duress which falls outside the Louisiana Credit Agreement Act and that the trial court erred in dismissing the duress cause of action with regard to these facts.

### *Conduct Prohibited by Law and Against Public Policy*

In their reconventional demand, the Vidrines reference a number of statutes found in Title 12 and Title 18 of the United States Code and assert that the Bank's actions in the various transactions violate these statutes, thereby providing them with a cause of action under these statutes. While recognizing that the Bank is a federally chartered bank subject to the provisions of the United States Code as referenced by the Vidrines, the trial court found that none of these statutes provide

24

them with a personal cause of action. The trial court did so by relying on the language found in 12 U.S.C. § 4638, which states:

> This chapter shall not create any private right of action on behalf of any person against a regulated entity, or any director or executive officer of a regulated entity, or impair any existing right of action under other applicable law.

This statute is found in Chapter 46 of Title 12, and is not directly dispositive of all the situations covered by the other provisions of Title 12 and Title 18 referenced by the Vidrines. However, this thread is consistent with the content of all referenced statutes in that they are all regulatory statutes, which set forth the compliance requirements of a federally chartered bank toward the federal regulatory agencies having jurisdiction over all federally chartered banks. Nothing in these statutes impairs existing rights, but nor do they establish a private cause of action for the Vidrines. We find no error in the trial court's determination that the Vidrines cannot maintain a cause of action on the basis of the federal statutes cited.

### *Detrimental Reliance*

In their reconventional demand, the Vidrines assert that they detrimentally relied on the promises made to them by Mr. Fontenot and the other officers of the Bank with regard to the various credit agreements they executed between March 28, 2003 and June 4, 2010. Although La.Civ.Code art. 1967 provides such a remedy generally, we find that any reliance on oral statements made in the credit agreement negotiation phase are clearly subject to the supreme court's decisions in *Whitney*, *Jesco*, and *King*, and cannot be the basis for a cause of action for detrimental reliance. We find no error in the trial court's determination that the Vidrines cannot maintain this cause of action.

25

### Breach of Contract

In its judgment, the trial court first ordered "that the VIDRINES'; reconventional demand[] for . . . breach of contract . . . fail[ed] to state a claim upon which relief can be granted." In the next paragraph, the trial court ordered "that the Exception of No Cause of Action is hereby sustained and the reconventional demand[] for . . . breach of any oral contract constituting a credit agreement . . . with the Bank [is] dismissed." Thus, the judgment could be interpreted as dismissing all claims for breach of contract, including those arising from the written credit agreements, or only those claims arising out of any oral contract entered into by the parties. In the case of either interpretation, we find no error in the trial court's determination that the reconventional demand failed to state a cause of action upon which relief could be granted.

A breach of a contract occurs when a party fails to perform an obligation under the terms of a contract which results in damages to the other party. *Favrot v. Favrot*, 10-986 (La.App. 4 Cir. 2/9/11), 68 So.3d 1099, *writ denied*, 11-636 (La. 6/5/11), 62 So.3d 127. In their reconventional demand, the Vidrines do not specifically state which contract has been breached. Instead, they assert that the "breaches" complained of consist "of the Bank's deliberate refusal to abide by the express terms of the contracts as proscribed by LSA-C.C. Art. 1994, and the Bank's failure to exercise good faith as required by both the terms of the contracts and LSA-C.C. Art. 1759." They further state in the reconventional demand that they "seek the dissolution of *all contracts at issue*, and in addition, damages as provided by LSA-C.C. Art. 2013." (Emphasis added.)

Louisiana Civil Code Article 1994 provides that "[a]n obligor is liable for the damages caused by his failure to perform a conventional obligation. A failure

26

to perform results from nonperformance, defective performance, or delay in performance." Additionally, La.Civ.Code art. 1759 provides that "[g]ood faith shall govern the conduct of the obligor and the obligee in whatever pertains to the obligation."

We have already concluded that the Louisiana Credit Agreement Act precludes a cause of action for any oral agreements entered into during the negotiations leading up to the written credit agreement and not included within that written agreement. However, the Vidrines seem to argue that it is the written credit agreements themselves that have been breached, and not the ancillary agreements arising from those written agreements. As pointed out in *Ramey*, 869 So.2d at 118, "Louisiana has chosen a system of fact pleading[,]" and "the mere conclusions of the plaintiff unsupported by facts does not set forth a cause of action." In this case, the Vidrines have not asserted facts to support a cause of action on that basis.

### *Tortious Interference with Contracts and Business Relationships*

In their reconventional demand, the Vidrines assert that they have a cause of action for damages based on Ms. Lejeune's interference with their efforts to sell the subdivision property, which led to the loss of a sale of the property. In its reasons for judgment, the trial court noted the supreme court's conclusion in *9 to 5 Fashions, Inc. v. Spurney*, 538 So.2d 228 (La.1989), that a plaintiff could maintain a cause of action against a corporate officer for tortious interference with a contract, but followed this circuit's decision in *Technical Control Systems, Inc. v. Green*, 01-0955 (La.App. 3 Cir. 2/27/02), 809 So.2d 1204, *writ denied*, 02-962 (La. 5/31/02), 817 So.2d 100, and declined to expand that cause of action to the corporation itself. We do not find that either of these cases are dispositive of the

interference issue before us. In both cases, the contract at issue was between the plaintiff and the defendant corporation. In the matter before us, the contract at issue is between the plaintiffs and a third party. Thus, this can better be described as a claim for tortious interference with a business relationship, and our courts do recognize a cause of action for this tort. *Bogues v. La. Energy Consultants, Inc.*, 46,434 (La.App. 2 Cir. 8/10/11), 71 So.3d 1128.

This issue of tortious interference with business relations was thoroughly discussed in *Bogues*, where the second circuit stated:

> The cause of action for tortious interference with business derives from La. C.C. art. 2315. Tortious interference is based on the principle that the right to influence others not to enter into business relationships with others is not absolute. *Junior Money Bags, Ltd.* [*v. Segal*, 970 F.2d 1 (5th Cir. 1992)], *citing Ustica Enterprises, Inc. v. Costello*, 434 So.2d 137 (La.App. 5th Cir.1983). Louisiana law protects the businessman from "malicious and wanton interference," though it permits interferences designed to protect legitimate interests of the actor. *Dussouy* [*v. Gulf Coast Inv., Corp.*, 660 F.2d 594 (5th Cir. 1981)]. A plaintiff bringing a claim for tortious interference with business must ultimately show "by a preponderance of the evidence that the defendant improperly influenced others not to deal with the plaintiff." *Junior Money Bags, Ltd., supra.* Significantly, it is not enough to allege that a defendant's actions affected plaintiff's business interests; the plaintiff must allege that the defendant actually prevented the plaintiff from dealing with a third party. *Ustica, supra.*

*Id.* at 1134-35.

While recognizing that a cause of action exists for tortious interference with a business relationship, the courts do not look on this particular cause of action with favor. *Id.* Proof of this cause of action has been made more difficult by the imposition of an "actual malice" element of proof on the plaintiff. *JCD Mktg. Co. v. Bass Hotels and Resorts, Inc.*, 01-1096, p. 11 (La.App. 4 Cir. 3/6/02), 812 So.2d 834, 841.

Although the Vidrines' burden of proof on this issue is significant, the facts in the reconventional demand clearly establish a cause of action for tortious

28

interference with their business relationship with the potential purchaser of the subdivision property. Furthermore, the Vidrines plead the "actual malice" element in their reconventional demand. This cause of action is not precluded by the Louisiana Credit Agreement Act, and the trial court erred in dismissing it.

### *Amendment of Pleadings*

In their final assignment of error, the Vidrines argue that the trial court erred in dismissing their claims for relief without first allowing them to amend their reconventional demand. Louisiana Code of Civil Procedure Article 934 (emphasis added) provides:

> When the grounds of the objection pleaded by the peremptory exception may be removed by amendment of the petition, the judgment sustaining the exception *shall* order such amendment within the delay allowed by the court. If the grounds of the objection raised through the exception cannot be so removed, or if the plaintiff fails to comply with the order to amend, the action, claim, demand, issue, or theory shall be dismissed.

Based on the foregoing, a party must be allowed the opportunity to amend their petition if the grounds for the exception can be remedied. *Alexander and Alexander, Inc. v. State, Div. of Admin.*, 486 So.2d 95 (La.1986).

We find that while the trial court did not err in concluding that the Vidrines had not stated causes of action for fraud and breach of contract, the trial court did err in not giving them the opportunity to attempt to state a cause of action by amendment as to these claims only. Thus, we remand the matter to the trial court with instructions to allow the Vidrines a period of time of not less than twenty days from the date of this opinion to amend their reconventional demand to, if they can, state a cause of action against the Bank for Mr. Fontenot's fraudulent action in using his position with the Bank to effect a $78,000.00 profit for himself; and state

29

facts sufficient to state a cause of action for breach of the written credit agreements set forth in their reconventional demand.

## DISPOSITION

We affirm that portion of the trial court judgment granting the exception of no cause of action filed by the defendant-in-reconvention, St. Landry Homestead Federal Savings Bank, and dismissing the claims of the plaintiffs-in-reconvention, Hubert Vidrine, Tammy Vidrine, and Vidrine Estates, LLC, based on conduct prohibited by law and against public policy and detrimental reliance. We affirm that portion of the trial court judgment finding that the plaintiffs-in-reconvention failed to state a cause of action for fraud and breach of contract, but reverse the trial court's dismissal of these claims and remand this matter to the trial court with instructions to allow the Vidrines a period of time of not less than twenty days from the date of this opinion to amend their reconventional demand to, if they can, state a cause of action against the Bank for these claims or have these claims dismissed. We reverse that portion of the trial court judgment the claim of the plaintiffs-in-reconvention for duress and for tortious interference with contracts and business relationships, and remand the matter to the trial court for further proceedings. We assess costs of this appeal equally between the plaintiffs-in-reconvention and the defendant-in-reconvention.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

30